**DIVISION 1287, AMALGAMATED TRANSIT UNION, AFL–CIO, Appellee,**

v.

**KANSAS CITY AREA TRANSPORTATION AUTHORITY, Appellant.**

No. 78–1255.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1978.

Decided Aug. 21, 1978.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 21, 1978.

---

Howard F. Sachs, Spencer, Fane, Britt & Browne, Kansas City, Mo., for appellant; Harry L. Browne and James R. Willard, Kansas City, Mo., on the brief.

Linda R. Hirshman, Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., for appellee; Earle Putnam, Gen. Counsel, Amalgamated Transit Union, Washington, D. C., on the brief.

Before STEPHENSON, Circuit Judge, INGRAHAM, Senior Circuit Judge,* and HENLEY, Circuit Judge.

HENLEY, Circuit Judge.

This is an action for declaratory and injunctive relief brought in the United States District Court for the Western District of Missouri (The Honorable John W. Oliver, District Judge) by Division 1287, Amalgamated Transit Union (Union) against the Kansas City Area Transportation Authority (Authority), which is a public agency that provides mass urban transportation in the general metropolitan area that includes the Cities of Kansas City, Missouri, and Kansas City, Kansas. The Authority was formed in 1967 as a result of a congressionally approved interstate compact between Missouri and Kansas and has received federal financial assistance running into many millions of dollars under the terms of the Urban Mass Transportation Act of 1964, as amended, 49 U.S.C. § 1601 et seq. (the Act).

The suit was filed to compel the Authority to engage in what is known as interest arbitration [1] to settle the terms and conditions of a collective bargaining agreement to take the place of one that expired on November 14, 1977.

The Union contends that it is entitled to interest arbitration by the terms of § 13(c) of the Act, 49 U.S.C. § 1609(c), by the terms of agreements entered into between the Union and the Authority as required by § 13(c) (§ 13(c) agreements), and by the grant contracts that have been entered into between the Authority and the government from time to time since 1968 which contracts have incorporated by reference the prevailing § 13(c) agreements. The Union takes the position that the suit arises under the Act, that the amount in controversy is in excess of $10,000.00, exclusive of interest and costs, and that federal jurisdiction existed in the district court by virtue of 28 U.S.C. § 1331(a).

The Authority contends that the district court lacked subject matter jurisdiction and that in any event the Union was not entitled to the relief that it sought.

The case was submitted to the district court largely on stipulations of fact. Judge Oliver filed detailed findings of fact, conclusions of law and comments. He concluded that he had jurisdiction and that the Union was entitled to prevail. An appropriate decree having been entered, this appeal followed.

I

The Union represents persons employed in certain capacities by private transit com-

---

* The Honorable Joe M. Ingraham, United States Senior Circuit Judge for the Fifth Circuit, sitting by designation.

1. Interest arbitration, which is sometimes called contract arbitration or quasi-legislative arbitration, is the arbitration that may be required when an employer and the collective bargaining agent of employees come to an impasse with respect to the terms and conditions of a new collective bargaining agreement. It differs from grievance arbitration which may be required when disputes arise under an existing collective bargaining agreement.

panies and public transportation agencies all over the United States. The record indicates that the Union is a strong believer in the proposition that labor disputes in the urban transportation industry should be settled by arbitration, including interest arbitration, rather than by strikes or lockouts.

As is well known, the urban mass transit industry in this country has been in a deteriorating condition for a long period of time. By 1964, and indeed earlier, Congress had concluded that many private companies would have to be taken over by public agencies, and that federal funds would have to be made available to those agencies in order to permit them to effect the take-overs. The result of that determination was the statute involved in this case.

The Act authorizes grants or loans of federal funds to state or local public authorities to enable them to acquire private transit companies. Employees of those companies will presumably become employees of the public agencies, and when it passed the Act Congress was concerned with the economic risks that such employees might incur as a result of the take-overs. Those risks might include loss of collective bargaining rights, loss of the right to strike, and loss of pension and retirement benefits. Section 13(c) of the Act is designed to protect, at least in large measure, the rights and interests of such employees from such risks.

In substance, § 13(c) provides that as a condition to a federal grant or loan the public agency applying for the same must enter into a protective agreement with the employees of the company to be taken over or with the collective bargaining agent of those employees. The agreement must be approved by the Secretary of Labor, and when approved it becomes a part of the grant contract between the agency and the government.

A § 13(c) agreement must preserve the rights of employees existing at the time of the public take-over, must preserve collective bargaining rights, and must protect employees from the worsening of their conditions of employment. The protection that must be provided against worsening of employment conditions must be at least equal to the protection that is afforded by 49 U.S.C. § 5(2)(f) to employees of rail carriers subject to the jurisdiction of the Interstate Commerce Commission who may be adversely affected by combinations or mergers of railroads.

## II

For many years prior to the Authority's establishment and take-over of mass transportation in the Kansas City area, patrons of mass transportation services relied principally on Kansas City Transit Company and on nine much smaller companies.

The employees of Kansas City Transit Company (Transit) were covered by the National Labor Relations Act, and the Union was their bargaining representative. The collective bargaining agreements that were in force between the Union and Transit from time to time contained no-strike clauses and also provided a procedure whereby the parties could agree to continue bargaining after the expiration of a contract and to submit to binding arbitration any contract terms with respect to which they found themselves unable to agree.

The last of the agreements between the Union and Transit was executed on December 6, 1967 and covered an initial period between November 1, 1967 and October 31, 1968. It was automatically to be renewed from year to year thereafter unless the Union or Transit gave notice of termination not less than sixty days from the anniversary date of the contract. If a notice of termination was not given within that period or was withdrawn before the termination of the contract, a new contract was to be negotiated between the parties and terms on which they could not agree would be settled by interest arbitration.

Having been duly formed, the Authority in 1968 applied successfully to the government for a multi-million dollar grant to enable it to take over Transit and the smaller companies, to buy new busses, and to improve transit services in the Kansas City

area. As required by the Act, a § 13(c) agreement was worked out between the Authority and the Union, was approved by the Secretary of Labor, and became a part of the grant contract between the Authority and the government.

The Authority took over urban transit operations in the Kansas City area in 1969, and since that time it has applied for and obtained numerous additional large grants of federal funds. In connection with the new grants new § 13(c) agreements have been entered into or it has been agreed that an existing agreement would be applicable to the new grant.

The Authority and the Union have entered into a number of collective bargaining agreements. At times the parties have not been able to agree as to the terms of a new agreement, and their disputes have been resolved by interest arbitration.

The most recent collective bargaining agreement between the Authority and the Union was executed in March, 1974 but was back-dated to November 1, 1973. The contract was to continue in force from year to year unless one of the parties gave written notice of termination not less than sixty days prior to the anniversary date of the contract.

By the fall of 1977 a number of differences between the Authority and the Union had arisen and on September 16, 1977 the Authority gave notice to the Union that the existing agreement would be terminated. The Union promptly demanded interest arbitration, and this suit was filed when the Authority refused to submit to arbitration as to the terms and conditions of a new contract.

### III

We address ourselves, first, to the question of whether the district court had subject matter jurisdiction of the complaint. The position of the Authority is that this is simply a suit on a contract and does not arise under the Constitution or laws of the United States. The defendant also contends that there is an absence of the amount in controversy that is requisite in order to confer jurisdiction under 28 U.S.C. § 1331(a).

■ As to jurisdictional amount, the district court found that the evidence was insufficient to establish "to a legal certainty" that the amount in controversy was not in excess of $10,000.00, exclusive of interest and costs, as to each employee of the Authority, and the district court also found that the Union's financial interest in the case exceeded the jurisdictional minimum. On this question it is sufficient to say that we agree with the district court. *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 346–48, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Gibbs v. Buck,* 307 U.S. 66, 72–76, 59 S.Ct. 725, 83 L.Ed. 1111 (1939); *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288–90, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *Local Div. 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility and the City of LaCrosse, Wisconsin,* 445 F.Supp. 798, 809–10 (W.D.Wis.1978), appeal pending. Cf. *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969); *Brotherhood of Railroad Trainmen v. Templeton,* 181 F.2d 527 (8th Cir.), cert. denied, 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605 (1950); and *Montgomery Ward & Co. v. Langer,* 168 F.2d 182 (8th Cir. 1948).

The question of whether the case is one that "arises under" the laws of the United States is a more troublesome one, and one that has not been answered as yet by any federal appellate court. The district courts are divided on the question. The majority of those courts have held that subject matter jurisdiction does not exist.[2] However,

---

2. *See Metropolitan Atlanta Rapid Transit Authority v. Local Division 732, Amalgamated Transit Union* (N.D.Ga.1973); *Local Div. No.* 714, *Amalgamated Transit Union v. Greater Portland Transit District* (D.Me.1978); *Local Div. 1285, Amalgamated Transit Union v. Jack-*

in *Local Div. 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility and the City of LaCrosse, Wisconsin, supra,* 445 F.Supp. at 804–09, District Judge Doyle of Wisconsin held that a case involving a claim of a breach of a § 13(c) agreement is a case that arises under the laws of the United States. As far as jurisdiction is concerned, Judge Oliver's holding in this case is expressly based on the opinion of Judge Doyle in *Local Div. 519.*[3]

■ The question of whether a particular case is one that "arises under" the Constitution or laws of the United States is not always an easy one to answer. 13 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE & PROCEDURE, § 3562, pp. 397–414. The question is entirely separate and distinct from the question of whether the plaintiff's complaint states a claim upon which relief can be granted and the question of whether there is any merit to the claim. *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 249, 71 S.Ct. 692, 95 L.Ed. 912 (1951); *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Gully v. First Nat'l Bank,* 299 U.S. 109, 112–14, 57 S.Ct. 96, 81 L.Ed. 70 (1936); *Norton v. Blaylock,* 285 F.Supp. 659, 661–62 (E.D.Ark. 1968), *aff'd,* 409 F.2d 772 (8th Cir. 1969).

In *Gully v. First Nat'l Bank, supra,* 299 U.S. at 112–13, 57 S.Ct. at 97, the Court said:

How and when a case arises 'under the Constitution or laws of the United States' has been much considered in the books. Some tests are well established. To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. *Starin v. New York,* 115 U.S. 248, 257, [6 S.Ct. 28, 29 L.Ed. 388]; *First National Bank v. Williams,* 252 U.S. 504, 512, [40 S.Ct. 372, 64 L.Ed. 690]. The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. *Ibid; King County v. Seattle School District,* 263 U.S. 361, 363, 364, [44 S.Ct. 127, 68 L.Ed. 339.] A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto (*New Orleans v. Benjamin,* 153 U.S. 411, 424, [14 S.Ct. 905, 38 L.Ed. 764;] *Defiance Water Co. v. Defiance,* 191 U.S. 184, 191, [24 S.Ct. 63, 48 L.Ed. 140;] *Joy v. St. Louis,* 201 U.S. 332, [26 S.Ct. 478, 50 L.Ed. 776;] *Denver v. New York Trust Co.,* 229 U.S. 123, 133 [33 S.Ct. 657, 59

---

son Transit Authority (W.D.Tenn.1977–78). Appeals are now pending in the Portland, Maine case and in the Jackson, Tennessee case.

Another case that is of interest here is *Div. 580, Amalgamated Transit Union v. Central New York Regional Transportation Authority,* N.D.N.Y. No. 77–CV–45. In that case the Union sought to compel interest arbitration and moved for a preliminary injunction; the defendant resisted that motion but did not immediately raise any jurisdictional question. The motion was denied by the district court, and the Union appealed. The action of the district court was upheld by the Court of Appeals for the Second Circuit without any cognizance being taken of a possible jurisdictional question. *Div. 580, Amalgamated Transit Union v. Central New York Regional Transportation Authority,* 556 F.2d 659 (2d Cir. 1977). On remand the defendant raised the question of subject matter jurisdiction, and the district court held that jurisdiction did not exist. There was another appeal by the Union. While that appeal was pending, the Union and the Transportation Authority settled their differences and executed

a new collective bargaining agreement. The court of appeals held that this development rendered the controversy moot and declined to pass on the jurisdictional question. *Div. 580, Amalgamated Transit Union v. Central New York Regional Transportation Authority,* 578 F.2d 29 (2d Cir. 1978).

3. An appeal is pending in that case. We note, however, that on February 14, 1978 a panel of the Court of Appeals for the Seventh Circuit refused to grant to the defendant utility a stay of the preliminary injunction that Judge Doyle had granted. The panel said "that the defendants-appellants must now proceed to arbitration does not constitute irreparable harm so as to justify this court in staying the preliminary injunction. That preliminary injunction was issued after careful consideration by the district court." Judge Oliver decided this case on February 28, 1978, and he mentions the Seventh Circuit's order of February 14 which had not been entered when this case was briefed in the district court.

L.Ed. 1101]), and the controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal. *Tennessee v. Union & Planters Bank*, 152 U.S. 454, [14 S.Ct. 654, 38 L.Ed. 511;] *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, [29 S.Ct. 42, 53 L.Ed. 126;] *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716; *Taylor v. Anderson*, 234 U.S. 74, [34 S.Ct. 724, 58 L.Ed. 1218.] Indeed, the complaint itself will not avail as a basis of jurisdiction in so far as it goes beyond a statement of the plaintiff's cause of action and anticipates or replies to a probable defense. *Devine v. Los Angeles*, 202 U.S. 313, 334, [26 S.Ct. 652, 50 L.Ed. 1046;] *The Fair v. Kohler Die & Specialty Co., supra.*

And the Court cited with approval the earlier case of *Shulthis v. McDougal*, 225 U.S. 561, 569, 32 S.Ct. 704, 706, 56 L.Ed. 1205 (1912), wherein it was said:

A suit to enforce a right which takes its origin in the laws of the United States is not necessarily, or for that reason alone, one arising under those laws, for a suit does not so arise unless it really and substantially involves a dispute or controversy respecting the validity, construction or effect of such a law, upon the determination of which the result depends.

■ More recently, this court held that if a case is to be considered as one arising under federal law, "the federal right relied upon for jurisdiction must be a paramount and not a collateral issue." *Baker v. Riss & Co.*, 444 F.2d 257, 259 (8th Cir. 1971).

■ And, of course, in order to confer federal question jurisdiction on a district court the federal question raised must be substantial and not plainly frivolous. *Hagans v. Lavine*, 415 U.S. 528, 536–38, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); 13 WRIGHT, MILLER & COOPER, *supra*, § 3564, pp. 426–30.

We have mentioned already the purpose of the Act and the concern of Congress with respect to the economic interests of employees of private transit companies that were to be taken over by public agencies. Sec-

tion 13(c) of the Act does not simply direct a public agency seeking a federal grant and a labor union representing transit employees to sit down at the bargaining table and enter into any kind of a contract that is mutually agreeable to them. As has been seen, § 13(c) prescribes at least minimum standards for employee protection, requires that the agreements in question be approved by the Secretary of Labor, and provides that the agreements become part of the contracts between the public agencies and the government itself.

■ Although the question is not free from doubt, we now hold that a controversy between a public transit agency and a labor union involving a claim of breach of a § 13(c) agreement is a controversy that arises under the laws of the United States. *See Ass'n of Machinists v. Central Airlines*, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963); *Tunstall v. Brotherhood of Locomotive Firemen & Enginemen*, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944); *Burlington Northern, Inc. v. American Railway Supervisors Ass'n*, 503 F.2d 58 (7th Cir. 1974), *cert. denied*, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975); *Brotherhood of Locomotive Engineers v. Chicago & North Western Ry. Co.*, 314 F.2d 424 (8th Cir. 1963), *aff'g Chicago & North Western Ry. Co. v. Brotherhood of Locomotive Engineers*, 202 F.Supp. 277 (S.D.Ia.1962).

### IV

On the merits the Authority makes two arguments for reversal: first, that as an alternative to interest arbitration the parties had a right to terminate their contractual relationship. Second, that an agreement by the Authority to binding interest arbitration would be illegal as an impermissible delegation of power by a public body. We reject both arguments.

### A

The controversy between the parties actually involves three separate and distinct contracts: (1) the underlying collective bargaining agreement between the Authority

and the Union; (2) the § 13(c) agreement between the Authority and the Union; and (3) the grant contract between the Authority and the government. This suit is based on the § 13(c) contract and not on the collective bargaining agreement or on the contract between the Authority and the government.

The first § 13(c) contract between the Union and the Authority was entered into in 1968; however, that contract does not differ substantially from the one that was entered into in 1973 and which has been extended to grants that the Authority has received from the government since that time. Section 24 of the 1973 § 13(c) agreement is as follows:

In the event the Project is approved for assistance under the Act, the foregoing terms and conditions shall be made part of the contract of assistance between the federal government and the applicant for federal funds, provided, however, that this agreement shall not merge into the contract of assistance, but shall be independently binding and enforceable by and upon the parties hereto, in accordance with its terms; nor shall the collective bargaining agreement between the Union and the operator of the transit system merge into this agreement, but each shall be independently binding and enforceable by and upon the parties thereto, in accordance with its terms.

The termination and arbitration provisions of the collective bargaining agreement between the Union and the Authority that was executed in 1974 appear as §§ 4 and 9 of that agreement, and those sections do not differ substantially, if at all, from comparable provisions appearing in the last collective bargaining agreement that the Union and Transit entered into in 1967. It appears to us that under the 1974 agreement either side could have avoided interest arbitration by giving a sixty day notice of termination. As has been pointed out, however, this suit is based on the § 13(c) agreement, and the rights of the parties must be measured by that agreement which is not identical in terms to the collective bargaining agreement. The controlling provision of the § 13(c) agreement is § 17 of that agreement which, insofar as here pertinent, is as follows:

In the case of any labor dispute (except as defined in paragraph (11) hereof) where collective bargaining does not result in agreement after all reasonable efforts to agree in good faith, the same may be submitted at the written request of either party to a board of arbitration composed of three (3) persons as hereinafter provided, one to be chosen by the Authority, one to be chosen by the Union, and the two thus selected to select a third disinterested arbitrator; the findings of the majority of said board of arbitration shall be final and binding on the parties hereto; all contract conditions shall remain undisturbed and there shall be no lockouts, strikes, walk-outs or interference with or interruption of service during the arbitration proceedings.

Each party shall appoint its arbitrator within five (5) days after notice of submission to arbitration has been given. If the two arbitrators selected by the parties are unable to agree upon the selection of the third arbitrator within five (5) days from the date of appointment of the second-named arbitrator, then either arbitrator may request the American Arbitration Association to furnish a list of seven (7) members of the National Academy of Arbitrators from which the third arbitrator shall be selected. The arbitrators appointed by the parties shall, within five (5) days after the receipt of such list determine by lot the order of elimination, and thereafter each shall, in that order, alternately eliminate one name until only one name remains. The remaining person on the list shall be the third arbitrator. In each instance, the foregoing time limits are exclusive of Saturday, Sunday and holidays. Such time limits may be extended by mutual agreement of the parties in writing.

\* \* \* \* \* \*

The term 'labor dispute' shall be broadly construed and shall include any contro-

versy concerning wages, salaries, working conditions or benefits, including health and welfare, sick leave, insurance or pension or retirement provisions, the making or maintenance of collective bargaining agreements, the terms to be included in such agreements, the interpretation of application of such agreements, the adjustments of grievances, any claim, difference, or controversy arising out of or by virtue of any of the provisions of this agreement for the protection of employees covered by this agreement affected by the Project.

The arbitration board shall make every reasonable effort to render its decision within thirty (30) days from the date of the completion of the hearings in the proceedings, or within such longer period as the parties to the proceedings may mutually agree upon in writing. The decision of the arbitration board shall be in writing, signed by a majority of the members thereof, and original counterparts thereof shall be filed with the Authority and the Union.

Nothing in this paragraph (17) shall be construed to enlarge or limit the right of either party to utilize, upon the expiration of any collective bargaining agreement, any economic measures that are consistent or not in conflict with applicable law.

■ In view of that language, we are of the opinion that the contract required interest arbitration at the request of either party upon the expiration of a collective bargaining agreement. Our conclusion is bolstered by the history of negotiations between the parties that is revealed by the record, and by the fact that on two occasions prior to 1977 contract differences between the Authority and the Union were in fact resolved by interest arbitration rather than by strikes or other economic measures.

B

■ In the district court the Authority contended broadly that an agreement to arbitrate the terms of a future collective bargaining agreement will not be enforced by the courts. Judge Oliver properly rejected that contention. *See Winston-Salem Printing Pressmen & Assistants' Union v. Piedmont Publishing Co. of Winston-Salem,* 393 F.2d 221 (4th Cir. 1968); *Greater Kansas City Laborers District Council v. Builders Ass'n of Kansas City,* 217 F.Supp. 1 (W.D.Mo.1963), *aff'd,* 326 F.2d 867 (8th Cir.), *cert. denied,* 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964).

The Authority contends here that any obligation on its part of engage in binding interest arbitration would amount to an unlawful delegation of the powers and authority that have been conferred upon it as a public body. We do not think that this argument can be sustained in the context of the present case.

■ As is well known, the federal policy in favor of arbitration as a means of settling labor disputes is a very strong one. In addition to the cases last cited, *see* the familiar *"Steel Workers Trilogy"* of cases beginning with *United Steel Workers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *see also General Electric Co. v. Local 205, United Electrical, Radio & Machine Workers of America,* 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957), and *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

That policy would appear to be particularly applicable in the vital area of urban mass transit where strikes of workers are in the highest degree undesirable from the standpoint of the public.[4]

■ We recognize that under the laws of some states employees of public agencies are not accorded collective bargaining rights nor do they enjoy the benefits of such bargaining, including arbitration. We think, however, that when a state or a combination of states forms a public transit agency for the express purpose of obtaining federal money to enable it to take over the

4. In this connection we call attention to the findings of Congress as to the importance of

mass urban transportation that are set out in 49 U.S.C. §§ 1601, 1601a and 1601b.

business of a private transit company, and where the agency in order to obtain the money enters into a § 13(c) agreement that calls for interest arbitration, the obligation to arbitrate is binding on the agency, regardless of general state law or policy.

We agree with Judge Doyle in *Local 519, supra,* 445 F.Supp. at 811, that Congress intended that the rights of transit employees be protected by contracts, and that it intended that the contracts entered into by the parties and approved by the Secretary of Labor would be enforceable, and that it would be fatuous to hold otherwise.

The judgment of the district court is affirmed.