**LOCAL DIVISION 1285, AMALGAMATED TRANSIT UNION, AFL/CIO/CLC, Plaintiff-Appellant,**

v.

**JACKSON TRANSIT AUTHORITY and the City of Jackson; William T. Coleman, Jr. and William J. Usery, in their official capacities, Defendants-Appellees.**

No. 78–1185.

United States Court of Appeals, Sixth Circuit.

Argued June 5, 1980.

Decided June 3, 1981.

Linda R. Hirschman, Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., Maurice Wexler, Heiskell, Donelson, Adams, Williams & Kirsch, Memphis, Tenn., for plaintiff-appellant.

W. J. Michael Cody, U. S. Atty., Robert M. Williams, Jr., Asst. U. S. Atty., Memphis, Tenn., Sidney Spragins, Spragins & Murchinson, Jackson, Tenn., Joseph S. Kaufman, Melnicove, Kaufman & Weiner, Baltimore, Md., for defendants-appellees.

Before MERRITT, KENNEDY and BOYCE F. MARTIN, Jr., Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

This appeal requires us to decide whether Section 13(c) of the Urban Mass Transportation Act, 49 U.S.C. § 1601 *et seq.*, ("UMTA"), creates a private federal cause of action for employees of local transit authorities which have received federal funds under the Act. We must also determine whether either the Secretary of Labor or the Secretary of Transportation has a statutory duty to enforce the terms of a "labor protective arrangement" executed pursuant to Section 13(c) of the Act. 49 U.S.C. § 1609(c).

In 1966, the City of Jackson, Tennessee applied for a federal grant to facilitate conversion of a failing private bus company into a public transit authority. As a condition of federal funding, Section 13(c) requires grant recipients to make "arrangements" for the protection of their employees' interests:

> It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a

worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of this title. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.

In order to qualify for a grant, Jackson Transit Authority entered into a "Section 13(c) agreement" with Local Division 1285, Amalgamated Transit Union, the collective bargaining agent for the transit employees. That agreement was duly submitted to the Secretary of Labor, who certified that it met the "fair and equitable" standard of Section 13(c). In accordance with Section 13(c)(5), the substance of this "arrangement" was incorporated in the grant contract between Jackson and the United States.

From 1966 until 1975, Jackson and the Union negotiated and honored a series of collective bargaining agreements. In 1975, however, Jackson allegedly repudiated its current collective bargaining contract and unilaterally reduced certain employee benefits. The Union, through its International president, sought determinations by the Secretaries of Labor and Transportation that Jackson had breached its obligation under Section 13(c) to continue collective bargaining. Both Secretaries refused to issue such a finding, whereupon the Union initiated this action.

In its complaint, the Union sought: 1) monetary and injunctive relief against Jackson; and 2) mandamus relief against the Secretaries. Jackson moved for dismissal on jurisdictional grounds; the Secretaries also moved for dismissal, or in the alternative, for summary judgment.

The District Court heard oral argument on the defendants' motions. On December 22, 1977, the court issued an order and memorandum opinion dismissing the complaint for lack of federal jurisdiction. That decision is reported at 447 F.Supp. 88.

On appeal, the Union argues that the court should have exercised jurisdiction over the controversy and inferred a private federal right of action against the transit authority from Section 13(c) of the Act. We agree. We reject, however, the Union's further claim for relief in the nature of mandamus against the Secretaries of Labor and Transportation.

I. The Complaint against Jackson.

A. Federal Jurisdiction.

The District Court dismissed the case for lack of federal jurisdiction. We disagree both with the court's analysis and its conclusion. The opinion below proceeds on the assumption that subject matter jurisdiction under 28 U.S.C. § 1331 is contingent upon the availability of a private federal remedy under Section 13(c). That approach is inconsistent with the analysis required by the Supreme Court in *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

*Bell v. Hood* emphasized the distinction between the threshold ascertainment of "arising under" jurisdiction and the question whether the plaintiff in a given case has stated a claim upon which relief can be granted:

> Jurisdiction, therefore, is not defeated ... by the possibility that the averments (of the complaint) might fail to state a cause of action upon which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action upon which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. 327 U.S. at 682, 66 S.Ct. at 776.

Our first determination, therefore, must be whether the Union's claim "arises under" the laws of the United States within the meaning of Section 1331. If it does, then federal jurisdiction obtains unless the claim is "immaterial," or "wholly insubstantial and frivolous," made "solely for the

purpose of obtaining jurisdiction," *Id.* at 682, 66 S.Ct. at 776. Section 1331 also requires a minimum amount in controversy of $10,000.00.

 It is axiomatic that for purposes of federal jurisdiction an "action" is defined in terms of the *right asserted*, not the remedy sought. *Cohens v. Virginia,* 6 Wheat. 264, 379, 55 L.Ed. 257 (1821). Furthermore, the federal right asserted must be an *essential* element of the plaintiff's cause of action. . *Gully v. First National Bank,* 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936); *Phillips Petroleum Co. v. Texaco, Inc.,* 415 U.S. 125, 127, 94 S.Ct. 1002, 1003, 39 L.Ed.2d 209 (1974).

In the instant case, the Union contends that Jackson, by disavowing an existing collective bargaining contract and by taking subsequent unilateral actions, has jeopardized a right guaranteed to transit employees by a federal statute.

Jackson, on the other hand, emphasizes the "private" nature of the Section 13(c) contract and advances the District Court's conclusion that the Union's complaint is "essentially a state breach of contract claim." In support of this position it cites *McFaddin Express, Inc. v. Adley Corp.,* 346 F.2d 424 (1965), in which the Second Circuit declared itself without jurisdiction to enforce a temporary management contract between two regulated, interstate carriers. The plaintiff in *McFaddin* brought an action in federal court for breach of that contract, relying for jurisdiction on an Interstate Commerce Commission order which "authorized" one carrier to manage the other for a period of six months. The court based its finding of no jurisdiction on: 1) the permissive rather than mandatory nature of the I.C.C. order; and 2) the absence of any "national interest" in the contract such that "federal principles (would) control the disposition of the case." However, we will demonstrate that neither ground of the *McFaddin* holding applies here.

 Jackson's assertion that the United States is not a party to the Section 13(c) agreement is correct but irrelevant; the decisive factor is that the agreement is so intertwined with the federal° statutory scheme that the rights it secures cannot be dismissed as "merely private." Not only does the statute require applicants to execute labor protective arrangements, but it also specifies a number of provisions those arrangements must include. One such mandatory provision is a guarantee that transit employees will enjoy continued collective bargaining rights after their private employer becomes a public authority. Moreover, the relationship of the Section 13(c) agreement with the federal scheme does not end with the negotiations of an "arrangement" between two private parties. On the contrary, Section 13(c) specifically states that no federal funds will be made available until the Secretary of Labor certifies that the agreement is "fair and equitable.". Furthermore, the terms of the Section 13(c) agreement must appear in the grant contract between the United States and the grant recipient.

Thus, in contrast to the contract in *McFaddin,* the Section 13(c) agreement is a mandatory means of preserving rights created by a federal statute. That Congress chose a "private" arrangement as the vehicle for protecting transit employees does not negate the fundamentally "federal" character of the rights it perpetuates. Inasmuch as the "right asserted" in this case derives from a federal statute, we can only conclude that the Union's claim "arises under" the laws of the United States. Similarly, this action is neither "insubstantial" nor "frivolous" within the meaning of *Bell v. Hood, supra.*

Because Jackson does not suggest that the Union's claim involves less than $10,-000.00, we shall deal summarily with the question of the amount in controversy. The Union plainly meets the standard established in *Saint Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938):

> [U]nless the law gives a different rule, the sum claimed by the plaintiff controls

if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

In light of these determinations, we hold that the District Court erred in dismissing this case for lack of federal jurisdiction. Our conclusion finds support in three Circuit Court decisions in actions nearly identical to this one. *Local Division No. 714 v. Greater Portland Transit District*, 589 F.2d 1 (1st Cir. 1978); *Local Division 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility*, 585 F.2d 1340 (7th Cir. 1978); *Division 1287, Amalgamated Transit Union v. Kansas City Area Transportation Authority*, 582 F.2d 444 (8th Cir. 1978), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). Each of those cases dealt with alleged breaches of Section 13(c) agreements by grant recipients. In each instance, the Court of Appeals upheld federal jurisdiction. We can discern only one significant distinction between these cases and the dispute before us. To the extent that this distinction has any effect at all, it strengthens the argument in favor of federal jurisdiction here. In every previous case, the plaintiff Union sought federal court enforcement of interest arbitration provisions contained in a Section 13(c) agreement. Unlike continued collective bargaining rights, interest arbitration is not explicitly required by the statute. Thus, for the other courts, whether or not the right to interest arbitration "arose under" federal law was a closer question than is our analogous inquiry into the source of continued collective bargaining rights.

*International Assoc. of Machinists v. Central Airlines, Inc.*, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963), a leading Supreme Court case on federal question jurisdiction, lends further support to our conclusion. *Central Airlines* arose from Section 204 of the Railway Labor Act, 45 U.S.C. § 184, which requires airlines and their employees' unions to establish, by private contract, airline boards of adjustment. The board of adjustment to which Central Airlines was subject was empowered by the contracting parties to resolve certain labor disputes and to make final and binding awards. Central refused to comply with one such award and the employees' union sought enforcement in federal court. The Supreme Court held that the action to enforce the award "arose under" federal law and gave rise to federal question jurisdiction:

> The contracts and the adjustment boards for which they provide are creations of federal law and bound to the statute and its policy. If any provision contained in a § 204 contract is enforceable, it is because of congressional sanction: "[T]he federal statute is the source of the power and authority.... The enactment of the federal statute ... is the governmental action ... though it takes a private agreement to invoke the federal sanction ... A union agreement made pursuant to the Railway Labor Act has, therefore, the imprimatur of the federal law upon it ... That is, the § 204 contract, like the Labor Management Relations Act § 301 contract, is a federal contract and is therefore governed and enforceable by federal law, in the federal courts. 372 U.S. at 692, 83 S.Ct. at 962. (citation omitted.)

Jackson attempts to distinguish *Central Airlines* by noting that the Supreme Court's decision was informed by the "national interest" in preserving stable labor relations in the airline industry. That argument, however, does little to advance Jackson's cause. First, the legislative history of UMTA reveals a similar policy behind the enactment of Section 13(c). *See* 109 *Cong. Rec.* 5670. Second, as Judge Doyle stated: the "purpose (of the Railway Labor Act) in no way controls the explicit and limited decision regarding federal subject matter jurisdiction." *Local Division 519 v. LaCrosse Municipal Trans.*, 445 F.Supp. 798, at 807.

B. The Implied Cause of Action.

We turn now to discuss whether the Union has a private federal remedy under Sec-

tion 13(c). The statute itself is silent on the question. We must therefore decide whether such a remedy arises by implication.

The Seventh Circuit had no difficulty resolving this issue:

> We agree with Judge Doyle's statement: "Congress intended that the contracts embodying the 'fair and equitable arrangements' were to be enforceable contracts. It would be fatuous to suggest otherwise. Because the contracts were to be enforceable, it follows that they were to be enforced at the instance of the parties to the contracts." 445 F.Supp. at 811.

> Based upon this premise, it follows that since the test for federal question jurisdiction has been met the remedy lies in federal court. The statutory scheme outlined in the Urban Mass Transportation Act and the policy underlying § 13(c) of the Act implies a federal private remedy. Support for this holding is found in *Central Airlines*. There the Court implicitly recognized the existence of a federal private remedy. 585 F.2d at 1349–50.

The court went on to state that an analysis under *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) is "unnecessary." *Id.* 585 F.2d at 1350.

■ Whether necessary or not to this decision, an inquiry similar to that in *Cort* reinforces our conclusion that this action is properly in federal court. *See Chartwell Communications Group v. Westbrook*, 637 F.2d 459 (6th Cir. 1980); *Curran, et al v. Merrill Lynch, Pierce, Fenner and Smith*, 662 F.2d 216 (6th Cir. 1980). *Cort* identified four characteristics of an implied cause of action:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39 [36 S.Ct. 482, 484, 60 L.Ed. 874] (1916) (emphasis supplied)— that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e. g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers*, 414 U.S. 453, 458, 460 [94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646] (1974) (Amtrak). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e. g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 423 [95 S.Ct. 1733, 1740, 44 L.Ed.2d 263] (1975); *Calhoon v. Harvey*, 379 U.S. 134 [85 S.Ct. 292, 13 L.Ed.2d 190] (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See *Wheeldin v. Wheeler*, 373 U.S. 647, 652 [83 S.Ct. 1441, 1445, 10 L.Ed.2d 605] (1963); cf. *J. I. Case Co. v. Borak*, 377 U.S. 426, 434 [84 S.Ct. 1555, 1560, 12 L.Ed.2d 423] (1964); *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 394–395 [91 S.Ct. 1999, 2003–2004, 29 L.Ed.2d 619] (1971); *id.*, at 400 [91 S.Ct. at 2006] (Harlan, J., concurring in judgment). 422 U.S. at 78 [95 S.Ct. at 2087].

Of these four factors, legislative intent is the most significant. *Touche Ross v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 [100 S.Ct. 242] 62 L.Ed.2d 146 (1979); *Taylor v. Brighton Corp.*, 616 F.2d 256 (6th Cir. 1980).

Section 13(c) clearly satisfies the first *Cort* test. That provision was enacted for the "especial" benefit of transit employees and, as we have already held, creates federal rights on their behalves.

The Union's argument is further substantiated when we apply the second and third *Cort* criteria—legislative intent, "explicit or implicit," and consistency with the overall statutory scheme. The legislative history of Section 13(c) is simply not explicit. Our review of the Congressional debates establishes that the precise means of enforcing

Section 13(c) agreements was not discussed. However, as Judge Doyle remarked:

> Of course, the best key to construction of § 13(c), so obvious in my view as to be dispositive of the issue, is that § 13(c) clearly contemplates contracts as the vehicles embodying the "fair and equitable arrangements;" that contracts are meant to be enforceable, not unenforceable; and that enforceability means the existence of some remedy in some forum. 445 F.Supp. at 817.

The Act offers no administrative solution to the problem of enforcing Section 13(c) agreements. By contrast, the implementation of certain other provisions of the statute is specifically delegated to the Department of Transportation. Unless we impute to the Secretary of Transportation the responsibility for handling labor relations disputes—an incongruous result which we decline to reach without a clear Congressional directive—we are left, if only by default, with an implied private cause of action. *See Lloyd v. Regional Transportation Authority*, 548 F.2d 1277 (7th Cir. 1977). We do note, however, that if the Act had provided any administrative mechanism under Section 13(c), our resolution of this issue might have been altogether different. *Transamerica Mortgage Advisors, Inc. v. Lewis, supra; Taylor v. Brighton Corp., supra; Bradford School Bus Transit, Inc. v. Chicago Transit Authority*, 537 F.2d 943 (7th Cir. 1976).

The only question remaining is whether proceedings to enforce Section 13(c) agreements must be relegated to state court, as the District Judge held, or whether Congress intended to permit plaintiffs to sue in federal court. Jackson invokes the fourth *Cort* test, asserting that municipal employee labor relations are "traditionally" the province of state law.

In this context, it is important to remember that Jackson's transit employees were covered by the National Labor Relations Act while the employer was a private bus company. When, however, the employer became a municipal agency, N.L.R.A. coverage ended. 29 U.S.C. § 152(2). Congress was well aware of the potential problems this transition could create, and enacted Section 13(c) to ensure that federal funds would not be used to deprive transit employees of certain benefits they had long enjoyed:

> The principle of protecting workers affected as a result of adjustments in an industry carried out under the aegis of Federal law is not new, particularly in the transportation industry. Thus, railroad employees for years have enjoyed Federal protection against adverse effects attendant upon railroad consolidations. The problems of worker protection presented by the bill are not necessarily identical to those presented under other laws. The committee believes, however, that workers for whom a standard of benefits has already been established under other laws should receive equally favorable treatment under the proposed new program. The committee also believes that all workers adversely affected by adjustments under the bill should be fully protected in a fair and equitable manner, and that Federal funds should not be used in a manner that is directly or indirectly detrimental to legitimate interests and rights of such workers. U.S. Code of Congressional and Administrative News 1964, Vol. 2 at 2569, 2584.

It is indisputable that Section 13(c) reflects *national* labor policy. *See* 109 *Cong. Rec.* 5670. Indeed, the legislative history reveals that several senators were concerned about possible conflicts between Section 13(c) and state law, particularly in the area of the right to strike. *Id.* at 5672–73. Senator Morse, the chief sponsor of the bill which became Section 13(c), assured his colleagues that state laws forbidding public employee strikes would supercede national labor policy, but *only* where the right to strike was concerned; *all other* collective bargaining rights would be protected. *Id.* at 5671–73. Senator Morse made the following comments on the bill:

It is impossible to satisfy all Senators. The reason why it is impossible to satisfy them all is that we cannot satisfy each instance and protect the Federal policy, because some changes are going to have to be made in some of the States to conform to the Federal policy.

I do not think there would be any great wrong done if we simply said to a State "You do not qualify for this Federal grant." It does not mean they are entitled, as a matter of right, to the Federal grants irrespective of the fact that they are not following a policy that is in conformity with a Federal policy .... *Id.* at 5675.

Jackson points out, correctly, that Section 13(c) was designed to encourage flexibility in formulating labor protective "arrangements." Senator Morse himself suggested that if local law prohibits collective bargaining by municipal employees, alternative solutions such as entrusting management of the transit authority to a private commission which *could* legally bargain with the union might be explored. *See also* Department of Labor Guidelines, 43 F.R. 13558 (3–31–78). The point, of course, is not that Congress was willing to make allowances for local problems. Rather, the point is that to qualify for federal funds, municipalities *must*, one way or another, undertake to protect the collective bargaining rights required by national labor policy.

■ In summary, the rights Section 13(c) preserves are federal rights. In *Transamerica Mortgage Advisors, Inc. v. Lewis, supra,* the Supreme Court found that Section 215 of the Investment Advisors Act creates a limited private right of action. In determining the appropriate forum for such an action, the Court observed:

One possibility, of course, is that Congress intended that claims under § 215 would be raised only in state court. But we decline to adopt such an anomalous construction without some indication that Congress in fact wished to remit the litigation of a federal right to the state courts. 444 U.S. at 20, n. 8, 100 S.Ct. at 247 n. 8.

Applying that approach to the present case, we hold that the Union is entitled to pursue its claim in federal court.

In reaching this decision, we note a recent tendency on the part of the Supreme Court to limit the inference of private actions from federal statutes. In *Touche Ross v. Redington, supra,* Justice Rehnquist was explicit on this point:

To the extent our analysis in today's decision differs from that of the Court in *Borak,* [*J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)], it suffices to say that in a series of cases since *Borak* we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today ... The ultimate question is one of congressional intent, not one of whether this Court thinks that it can improve on the statutory scheme that Congress enacted into law. 442 U.S. at 578 [99 S.Ct. at 2490]. (citation omitted.) *See also Transamerica Mortgage Advisors, Inc. v. Lewis, supra.*

A careful reading of those cases, however, persuades us that neither *Touche Ross* nor *Transamerica* requires a different result here.

In *Touche Ross,* the Court declined to infer a private right of action from Section 17(a) of the Securities Exchange Act of 1934, which requires broker-dealers to maintain certain records and file certain reports with the SEC. The Court emphasized that Section 17(a) neither grants private rights to the members of an identifiable class, nor prohibits specific conduct. 442 U.S. at 569, 99 S.Ct. at 2485. Here, by contrast, we have already found that Section 13(c) of the Act does confer federal rights on transit employees, including the right to continued collective bargaining.

*Transamerica* involved not only Section 215 of the Investment Advisors Act, noted

above, but Section 206 of that statute as well. The Court held that Section 206 does not imply a private cause of action. Unlike the statute in *Touche Ross*, Section 206 does explicitly prohibit investment advisors from engaging in certain fraudulent practices. Concededly, it was enacted for the protection of investment advisors' clients. However, the Court makes clear that the dispositive issues in *Transamerica* were the overall statutory scheme, which includes no fewer than three enforcement provisions yet omits any reference to private suits, and the legislative history, which strongly suggests that Congress did *not* intend to imply a private right of action. No such benchmarks appear in the present case. We have found nothing in the Act or its history which indicates that Congress intended to deny transit employees an opportunity to enforce their federal rights in federal court.

II. The Union's Claim against the Secretaries of Labor and Transportation.

We begin our discussion of this final issue by pointing out that the threshold inquiry is whether either Secretary has a statutory duty to enforce Section 13(c) agreements on behalf of transit employees. If no such duty exists, our analysis need go no further.

■ The Act makes only two references to the role of the Secretary of Labor. Sections 3(e)[1] and 13(c) require the Secretary, as part of the grant approval process, to certify that labor protective arrangements are "fair and equitable." Neither section intimates that the Secretary is expected to supervise the conduct of the parties after an acceptable agreement is reached and the grant disbursed. According to the Union, however, "it stands to reason" that the Secretary should also bear continuing responsibility for enforcing the terms of Section 13(c) agreements. Whether or not we agree with the policy behind the Union's position, we decline to substitute our judgment on the issue for that of Congress.

The legislative history affords the Union no more support than does the statute itself. In the course of the Senate and House Hearings on the bill, then-Secretary of Labor Wirtz referred to the "administration" of Section 13(c). On each occasion, however, his remarks were made in the context of formulating guidelines for "fair and equitable" arrangements. Senate Hearings on S.6, 88th Congress, 1st Sess. at p. 309. *See also* S.Rep. # 82, 88th Cong., 1st Sess. 28; H.R.Rep. # 204, 88th Cong., 1st Sess. 16.

Unlike the Secretary of Labor, the Secretary of Transportation does have several specific enforcement obligations under the Act. Section 3(f), 49 U.S.C. § 1602(f), for example, explicitly requires him to supervise *and* enforce protective arrangements which ensure that federal grants will not be used to force private charter bus operators out of the competitive market. Similarly, Section 3(g), 49 U.S.C. § 1602(g) requires an agreement by grant recipients not to engage in school bus operations except under limited circumstances. Again, the Secretary of Transportation has specific enforcement duties. To administer his responsibilities in the areas of school and charter bus operations, the Secretary has promulgated extensive regulations which include provisions for judicial review of agency action in accordance with the Administrative Procedure Act. 49 C.F.R. 604.1 *et seq.*; 49 C.F.R. 605.1 *et seq. See also Bradford School Bus Transit, Inc. v. Chicago Transit Authority, supra.*

With respect to Section 13(c), however, we are unable to conclude that Congress has imposed mandatory enforcement duties on the Secretary of Transportation. In the first place, the only administrative official even mentioned in that section is the Secretary of Labor, whose limited role we have already discussed. It would be unreason-

---

1. Section 3(e) of the Act (49 U.S.C. § 1602(e)) provides in pertinent part:

 No financial assistance shall be provided under this chapter to any State or local public body ... unless ... (4) the Secretary of Labor certifies that such assistance complies with section 1609(c) [Section 13(c)] of this title.

able to assume that Congress intended to require the Department of Transportation to resolve labor relations disputes, yet neglected to say so despite its explicit mandate under other sections of the statute. Furthermore, we have discovered nothing in the legislative history to indicate that Congress contemplated the result the Union seeks here. This statute was enacted eighteen years ago, yet nothing in the record before us suggests that the Secretary of Transportation has ever assumed responsibility for enforcing the terms of labor protective agreements. This factor alone is scarcely dispositive of the issue. However, it is not unlikely that Congress would have amended Section 13(c) had it perceived a need for active enforcement by the Department of Transportation. Indeed, Congress did respond to just such a need when it added Section 3(f), discussed above, to the Act in 1974.

We are aware that the First Circuit has indicated a belief that the Secretary of Transportation has at least discretionary authority to enforce labor protective arrangements by virtue of Section 12(e) of the Act. [49 U.S.C. § 1608(e)]. *Local Division 714 v. Greater Portland Transit District, supra.* It stopped short of deciding that transit employees can compel the Department of Transportation to take action, although it characterized that possibility as "plausible." 589 F.2d at 14. It is impossible to determine from *Greater Portland* whether our decision here actually conflicts with the law in the First Circuit, since that court's analysis was purely hypothetical. The Secretary of Transportation was not a party to that case, and the question of administrative enforcement of Section 13(c) was not at issue. Instead, the First Circuit offered its interpretation of the Secretary's statutory role as one of several arguments in favor of inferring a private federal cause of action on behalf of the plaintiff union.

In any event, the Union has failed to demonstrate a sufficient reason to compel the Secretary of Transportation to take ac-

tion in this controversy. In the absence of a clear Congressional mandate, we decline to force the Department of Transportation to supervise labor-management relations.

The judgment of the District Court dismissing the Union's claim against Jackson is reversed and remanded for proceedings consistent with this opinion. The judgment dismissing the claim against the Secretaries for lack of jurisdiction is reversed with instructions to enter a judgment dismissing the claim for failure to state a cause of action upon which relief can be granted.

MERRITT, Circuit Judge, dissenting.

The key question in this case is whether § 13(c) of the Urban Mass Transportation Act, 49 U.S.C. § 1601 *et seq.* (1976), a grant program established in 1964, creates a private federal right of action for breach of contract for employees against local municipal transit authorities receiving federal funds. Section 13(c) provides that there shall be no federal funding under the Act in the absence of "fair and equitable arrangements ... as determined by the Secretary of Labor, to protect the interests of employees affected by" the program. The section goes on to say that "[s]uch protective arrangements shall include ... provisions" respecting topics such as the "preservation" and "continuation" of collective bargaining rights and prevention of "a worsening" of employee rights. The section says that "[t]he contract for the granting of any such assistance shall specify the terms and conditions of the protective [employee] arrangements." 49 U.S.C. § 1609(c).

In this case the municipal transit authority allegedly decided after a collective bargaining agreement had been in effect for several months not to abide by portions of the agreement that required cost of living increases. The employees sued the city in federal court for enforcement of their contract.

Last week the Supreme Court decided another in a long line of private right of

action cases. It unanimously held that § 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403, does not create a private right of action, *California v. Sierra Club,* —— U.S. ——, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). Our Court had previously decided the question the other way. *Norfolk & Western Co. v. United States,* 641 F.2d 1201 (6th Cir. 1980). The concurring opinion in the *Sierra Club* case by Justice Rehnquist for himself, the Chief Justice, and Justices Stewart and Powell, observes that courts of appeals are continuing to analyze the private right of action problem incorrectly and to imply too much—in "five of the last six statutory implied right of action cases" creating a new action the "analysis by the Courts of Appeals" has been wrong, —— U.S. at ——, 101 S.Ct. at 1783.

The opinion for the court in the *Sierra Club* case, written by Justice White, emphasizes that the inquiry in such cases is now fairly narrow:

> As recently emphasized, the focus of the inquiry is on whether Congress intended to create a remedy [citing recent cases]. The federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide.

—— U.S. at ——, 101 S.Ct. at 1781.

Although Congress intended to have the Secretaries of Labor and Transportation protect the interests of transit employees as a class, I do not see in this statute or its legislative history that Congress intended to create a new, original, federal, private right of action for breach of contract claims. The Secretary of Transportation can withhold funds, or perhaps the Secretary of Labor can take administrative steps, if they disapprove of the city's conduct toward its transit employees. The Secretary of Transportation can sue to enforce his agreement with a municipality. 49 U.S.C. § 1608(a). But there is nothing in the statute itself or the committee reports and debates that even hints that Congress contemplated that federal courts would decide what contractual rights should be preserved and what salary and fringe benefits are "fair and equitable" when a municipal transit worker is aggrieved by the action of his employer. There is a large number of bus drivers in the country, and Congress wanted them to know that it had considered their interests and authorized some administrative protection. But this does not mean that Congress intended to engraft a judicial remedy on the statute. Congress has not provided a principle or rule of decision for us to administer in such cases—other than general fairness. There is at stake no clearly enunciated national policy relating to municipal employee relations. There is no reason to think that state courts in the performance of their traditional, common law role cannot decide these private breach of contract cases just as fairly and just as efficiently as federal courts.