LOCAL DIVISION 732, AMALGAMATED TRANSIT UNION, Plaintiff-Appellee,

v.

METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY, Defendant-Appellant.

No. 81–7613.

United States Court of Appeals, Eleventh Circuit.

Jan. 29, 1982.

Kutak, Rock & Huie, Lawrence L. Thompson, Terrence Lee Croft, Atlanta, Ga., for defendant-appellant.

Jacobs, Burns, Sugarman & Orlove, Linda R. Hirshman, Chicago, Ill., Sinclair & Dixon, Clayton Sinclair, Jr., Atlanta, Ga., for plaintiff-appellee.

Before GODBOLD, Chief Judge, TJOFLAT and VANCE, Circuit Judges.

TJOFLAT, Circuit Judge:

Local Division 732, Amalgamated Transit Union (the Union) brought this action against the Metropolitan Atlanta Rapid Transit Authority (MARTA) seeking to restrain MARTA from terminating cost of living allowances to represented MARTA employees pending arbitration of a new collective bargaining agreement. The district court, 519 F.Supp. 498, entered a preliminary injunction enjoining MARTA from withholding the cost of living allowance at the levels existing on the last day of the recently expired collective bargaining agreement. Because the district court lacked subject matter jurisdiction over this case, we vacate its order and remand with instructions to dismiss.

I.

The Urban Mass Transportation Act of 1964 (UMTA) enables state and local agencies to obtain federal assistance to finance mass transportation services in urban areas. 49 U.S.C. § 1602 (1976). Section 13(c) of the Act, 49 U.S.C. § 1609(c) (1976), establishes as a "condition of any assistance . . . that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance." The section further requires that the labor protective arrangements include such provisions as may be necessary to certain enumerated objectives. Finally, § 13(c) directs that the "terms and conditions of the protective arrangements" shall be specified in the grant contract between the local authority and the federal government.[1] In practice, the protective arrangements made pursuant to § 13(c) are written agreements (13(c) agreements) negotiated between the applicant for federal assistance and the bargaining representative of its employees and then approved by the Secretary of Labor.

MARTA, a public body corporate providing transit service in Atlanta, Georgia, has received UMTA grants for the acquisition, improvement, and operation of its bus and rail transit system. As a grant applicant, MARTA has entered into 13(c) agreements with the Union, which is the collective bargaining representative for a unit of MARTA's employees. The most recent such agreement was executed on February 14, 1977, and, like its predecessors, was determined by the Secretary of Labor to be a fair and equitable protective arrangement.

---

1. Section 13(c) provides in full:

(c) It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of this title. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.

Paragraph (20) of the 1977 13(c) agreement provides that:

In case of any labor dispute . . . which cannot be settled by collective bargaining within sixty (60) days, such dispute or controversy may be submitted at the written request of either party hereto to a board of arbitration as hereinafter provided. . . . The decision by majority vote of the arbitration board shall be final, binding and conclusive: *all contract conditions shall remain undisturbed,* there shall be no lock-outs, strikes, walk-outs or interference with or interruption of MARTA operations during the arbitration proceedings or to upset the award. . . . Except where arbitration is requested as provided hereinabove, nothing in this Agreement shall be construed to enlarge or limit the right of any party to utilize, upon the expiration of any collective bargaining agreement, any economic measures that are not inconsistent or in conflict with applicable laws.

(Emphasis added.)

Until midnight on June 27, 1981, the Union and MARTA were also parties to a three-year collective bargaining agreement (the labor contract). The labor contract entitled represented employees to receive twelve quarterly Cost of Living Allowances (COLA's) computed with reference to the Consumer Price Index.

On April 23, 1981, MARTA notified the Union that it would terminate the labor contract upon its June 27 expiration and that it desired to negotiate a new collective bargaining agreement. On June 25, 1981, the Union requested arbitration of the terms and conditions of a new collective bargaining agreement, and the parties proceeded to arbitration. Also on June 25, MARTA informed the Union that since the COLA obligation terminated upon the expiration of the labor contract, MARTA would cease paying COLA's on June 27. Elimination of the COLA would reduce the affected employees' salaries by approximately 25%.

Alleging that cessation of COLA payments would violate the provision of paragraph 20 of the 1977 13(c) agreement that all contract conditions remain undisturbed pending arbitration, and would therefore violate UMTA § 13(c), the Union commenced this action on June 29, 1981, seeking to enjoin MARTA from discontinuing COLA payments pending arbitration of the new collective bargaining agreement. The complaint predicated jurisdiction on the UMTA and on 28 U.S.C. § 1331 (1976).

Following hearings on the Union's motion for a temporary restraining order, the district court treated the motion as a motion for a preliminary injunction and orally enjoined MARTA from withholding COLA payments at June 27, 1981, levels. The court subsequently entered findings of fact and conclusions of law and preliminarily enjoined MARTA "from withholding COLA payments at the levels existing on June 27, 1981, the last day of the [labor contract]."

MARTA raises three points on appeal: (1) that the district court lacked subject matter jurisdiction; (2) that the Union's complaint failed to state a claim upon which relief could be granted because there is no private federal cause of action to enforce labor protective arrangements under UMTA § 13(c); (3) that the Norris-LaGuardia Act precludes such injunctive relief as the district court granted. We conclude that the district court lacked subject matter jurisdiction over this case.[2] Therefore, without reaching the Norris-LaGuardia issue, we remand with instructions to dismiss.

## II.

The jurisdiction of federal courts is, of course, limited; the federal district court may exercise only that jurisdiction which Congress has prescribed. *Chicot County Drainage District v. Baxter State Bank,* 308 U.S. 371, 376, 60 S.Ct. 317, 319, 84 L.Ed. 329 (1940); *Marshall v. Gibson's Prod-*

---

2. When, as here, the essential inquiry is whether a substantive enactment embodies an implicit jurisdictional grant, the question of jurisdiction and the question whether there is a feder-

ally cognizable right of action inevitably merge. See text at p. 413, *infra.* Therefore, although this opinion focuses on the jurisdictional in-

ucts, Inc., 584 F.2d 668, 672 (5th Cir. 1978).[3] A corollary to this principle is that Congress may withhold from the federal courts jurisdiction over a class of cases despite the inclusion of that class within the judicial power of the United States defined in article III, § 2 of the Constitution.[4] *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 448, 12 L.Ed. 1147 (1850); *Turner v. Bank of North America*, 4 U.S. (4 Dall.) 7, 11, 1 L.Ed. 718 (1799); *Marshall*, 584 F.2d at 672. We proceed by articulating in turn the theories of action advanced in the Union's complaint and by determining as to each whether Congress has prescribed jurisdiction.

The complaint alleges that MARTA's termination of COLA payments constitutes a breach of the 1977 13(c) agreement. Even though UMTA § 13(c) inspired the 13(c) agreement, the Union does not dispute that a complaint alleging a breach of the agreement, *without more*, would set forth only a breach of a private contract and would not invoke federal jurisdiction.

The complaint further alleges that breach of a 13(c) agreement violates UMTA § 13(c). The Union argues that by conditioning financial assistance on the execution of fair and equitable arrangements as determined by the Secretary of Labor, and by commanding that the grant contract specify the terms and conditions of such arrangements, Congress implicitly required that grant recipients comply with the labor protective arrangements. From this, the argument proceeds, it follows that there is an implied grant of federal jurisdiction within the UMTA or, at the least, "arising under" jurisdiction under 28 U.S.C. § 1331 (1976) over actions to enforce § 13(c).

It is necessary to distinguish between the Union's theory as we have just paraphrased it and an alternative theory, namely, that though Congress did not implicitly declare that to breach a 13(c) agreement is to violate the UMTA, Congress did implicitly declare that a party injured by breach of a 13(c) agreement could seek his contract remedy in federal district court. Under the former theory, the action is for violation of a federal statute prohibiting breaches of 13(c) agreements; under the latter theory, the action is for breach of contract—a claim rendered cognizable in federal court by Congress' implicit grant of jurisdiction.

For the reasons stated below, we conclude that an inquiry into whether Congress implicitly provided that breaches of 13(c) agreements are violations of federal statutory law would be misdirected and fruitless and, for the most part,[5] would not even serve the Union's interest, given our willingness to inquire whether the UMTA implicitly grants to the district courts jurisdiction over private actions for breach of 13(c) agreements. We therefore reject the Union's theory without prolonged analysis and devote our serious consideration to the alternative theory.

First, the Union does not argue, and the legislative history belies, that there is any remedy, implied or otherwise, for the statutory violation the Union alleges. Thus, under the Union's theory, a plaintiff alleging a violation of UMTA § 13(c) via a breach of a 13(c) agreement can seek no remedy other than the common law remedies for breach of the underlying 13(c) agreement. The irony of the Union's theory is apparent: a party aggrieved by a breach of a 13(c) agreement, being limited to common law contract remedies, will allege the statutory violation *solely* as a jurisdictional device. Functionally, then, the implicit statutory provision which the Union hypothesizes ("The parties to an arrangement made pursuant to this subsection shall comply with the terms and conditions of such arrange-

---

quiry, we discuss MARTA's second point as necessary.

**3.** We are bound by decisions rendered by the Court of Appeals for the Fifth Circuit before the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981). This opinion therefore relies on

Fifth Circuit precedent and employs the first person plural in discussing Fifth Circuit cases.

**4.** Exceptional is the self-executing grant of jurisdiction to the Supreme Court in article III, § 2, cl. 3 of the Constitution. *See Marshall v. Gibson's Products*, 584 F.2d at 672, n.4.

**5.** See note 6, *infra*.

ment; any breach thereof shall be a violation of this subsection") is equivalent to the alternative implicit jurisdictional grant.[6] This alone would persuade us to give serious consideration only to the latter theory.

Our view is buttressed by a close reading of *Local Division 714, Amalgamated Transit Union v. Greater Portland Transit District*, 589 F.2d 1 (1st Cir. 1978) (*Portland*). There, the Court of Appeals for the First Circuit, while holding that noncompliance with a labor protective arrangement violates UMTA § 13(c), *id.* at 12, was thereafter incapable of speaking in terms of a statutory violation rather than in terms of a breach of contract. The *Portland* court stated:

> Having concluded that § 13(c) contemplates that a grant recipient live up to the labor protective arrangements upon which its grant is conditioned, and that noncompliance therefore violates § 13(c), the next aspect of the inquiry is whether there is a private federal remedy available to the Union *for breach of such an arrangement.*

*Id.* (emphasis added). And,

> We ... conclude that the Union does have a federal cause of action, implied from UMTA § 13(c), *to enforce labor protective arrangements....*

*Id.* at 16 (footnotes omitted) (emphasis added). The italicized language demonstrates that the *Portland* court recognized, despite the formulation of its holding, that a lawsuit arising out of a breach of the terms of a 13(c) agreement is at bottom an action on a contract and not an action on a statutory violation.

Finally, the method by which we would ascertain whether the UMTA implies a statutory violation for breach of a 13(c) agreement is the same method by which we will ascertain whether the UMTA implies federal jurisdiction over an action for breach of a 13(c) agreement. In both instances, we would examine the legislative history to determine congressional intent. The legislative history of the UMTA does not offer the kind of smoking gun that would make clear precisely what, if anything, Congress intended to imply into the statute. If we were to conclude that the legislative history manifested the intent that a party injured by breach of a 13(c) agreement be able to sue in federal court, it would profit the Union nothing in terms of jurisdiction[7] for us to conclude further that Congress intended that the action be for a statutory violation. Indeed, it would be ludicrous to conclude that Congress, solely in order to create federal jurisdiction over this class of cases, chose the convoluted route of implicitly commanding compliance with 13(c) agreements and then implicitly granting jurisdiction over cases alleging violations of that command, in preference to the direct route of granting jurisdiction over actions for breaches of 13(c) agreements.

For these reasons, we decline to entertain further the theory that breach of a 13(c) agreement is a statutory violation, and we proceed to consider the more straight forward contention that Congress, in order to ensure that labor protective arrangements be complied with, implicitly provided a federal forum for suits to remedy their breach.

---

6. The Union maintains that since a breach of a 13(c) agreement is a violation of UMTA § 13(c), the Union has an action under 42 U.S.C. § 1983 (1976) according to the rule of *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), as well as under the UMTA. In addition to affording the Union yet another jurisdictional theory, see p. 428, *infra*, this argument is also the basis of the Union's claim for attorneys' fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1976). In this limited respect, our statement that the Union's jurisdictional theory and the alternative theory are functionally equivalent is inaccurate; by rejecting the proposition that breach of a 13(c) agreement violates the UMTA we foreclose an award of attorneys' fees under 42 U.S.C. § 1988. This consideration does not influence our analysis of Congress' intent in enacting the UMTA; the Union does not contend, and we would repudiate as frivolous, that Congress intended that breaches of 13(c) agreements be statutory violations *so that* attorneys' fees could be awarded.

7. See note 6, *supra*.

## III.

The issue before us is whether UMTA § 13(c) gives to a private party the right to seek a remedy for breach of a 13(c) agreement in a United States district court. The briefs of the parties and, to some extent, the case law reflect confusion concerning the relationship between federal subject matter jurisdiction and implied private rights of action. The confusion is understandable because, in the context of our present inquiry, the two concepts are inextricably intertwined. The question is whether Congress intended that a private party aggrieved by breach of a 13(c) agreement be permitted to sue in federal court. If Congress implicitly granted to the federal district courts jurisdiction over this class of cases, it would follow necessarily that Congress implicitly granted to the appropriate plaintiffs the right to bring suit.[8] Analytic precision, however, demands that our focus be on the implicit grant of jurisdiction rather than on the implicit creation of a right of action. In this instance, there is no question but that there is a private cause of action for breach of a 13(c) agreement. That action is the common law action on a contract, and it exists independent of congressional intent.[9] The Union's contention that it has a federal cause of action therefore reduces to the contention that the federal district court has jurisdiction of an undeniably extant cause of action.

Since the question is not whether the Union has a private cause of action for breach of a 13(c) agreement, the four-step analysis of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), as refined by its progeny, is not controlling.[10] The jurispru-

---

**8.** In *Marshall v. Gibson's Products, Inc.*, 584 F.2d 668 (5th Cir. 1979), we held that the district court lacked subject matter jurisdiction over an action by the Secretary of Labor to enjoin an employer to submit to an inspection of its premises under Occupational Safety and Health Act § 8(a), 29 U.S.C. § 657(a) (1976). The dissent commented, "The court reaches [its] result in terms of subject matter jurisdiction. While I think ... that this is not a question of jurisdiction at all, but rather a question of whether the Secretary's complaint alleges a state of facts upon which relief could be granted, the court must still answer the same question. That question is whether the Occupational Safety and Health Act of 1970 gives to the Secretary of Labor the right to file a suit in a United States District Court to compel the inspection which § 657(a) of the Act requires the Secretary to perform." 584 F.2d at 679 (Tuttle, J., dissenting). *See also, Local Division 714, Amalgamated Transit Union v. Greater Portland Transit District*, 589 F.2d 1, 16 note 12 (1st Cir. 1978).

**9.** In this regard, this case differs sharply from most cases which have turned on whether Congress intended to create a private cause of action for violation of a federal statute. In those cases, absent Congress' creation of the cause of action, there could be no lawsuit, either in state or federal court. *See, e.g., Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Reddington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

**10.** The *Cort* analysis would pose a more formidable obstacle to the Union than does the analysis we undertake. We inquire simply whether the UMTA and its legislative history clearly manifest Congress' intent to grant federal jurisdiction over this case. The factors enumerated in *Cort* for determining whether a private remedy is implicit in a statute not explicitly providing one are: (1) whether the plaintiff is a member of the class for whose especial benefit the statute was created; (2) whether there is any indication of legislative intent either to create or deny the remedy sought; (3) whether the implication of such a remedy as is sought is consistent with the underlying statutory purposes; (4) whether the cause of action is one that is traditionally relegated to state law. 422 U.S. at 78, 95 S.Ct. at 2088. As we note at p. 415, *infra*, the Supreme Court appears to have telescoped the *Cort* test into an inquiry into legislative intent. The first of the four *Cort* factors continues nonetheless to be applied, and courts applying it have sought to determine whether Congress intended to create a federal right in favor of the plaintiff by focusing on the "right- or duty-creating language" of the statute as "the most accurate indicator of the propriety of the implication of a cause of action." *Cannon v. University of Chicago*, 441 U.S. 677, 690 n.13, 99 S.Ct. 1946, 1954 n.13, 60 L.Ed.2d 560 (1979); *United States v. Capeletti Bros., Inc.*, 621 F.2d 1309 (5th Cir. 1980); *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1079 (5th Cir.), *cert. denied*, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980). Our analysis spares the Union the necessity of overcoming this hurdle, and properly so, since the Union has a cause of action and the sole question is where it may bring it.

dence of implied private rights of action nonetheless appropriately informs our view of this case. In addition to the close relationship between the private right of action inquiry and the jurisdictional inquiry,[11] the private right of action cases are our most instructive authority on the courts' views on legislation by implication.

The recent jurisprudence of implied private rights of action manifests two undeniable trends. First, the Supreme Court has treated implied rights of action with increasing parsimony, and the trend is discernible even in the few years since the Courts of Appeals for the First, Seventh, and Eighth Circuits decided the issue now before us.[12] Second, the Court of Appeals for the Fifth Circuit, in light of Supreme Court developments, has implemented a restrictive view of implied causes of action, and has in several instances refused to infer a right of action which its sister courts have recognized. A brief review of these two trends will set the stage for our excursion into the legislative history of the UMTA.

Displaying what has been described as a drastic change in attitude, the Supreme Court has imposed increasingly severe restrictions on the availability of implied causes of action under federal statutes. See Note, Implied Rights of Action in Federal Legislation: Harmonization within the Statutory Scheme, 1980 Duke L.J. 928. The Court of Appeals for the Fifth Circuit has repeatedly noted this phenomenon, see, e.g., Noe v. Metropolitan Atlanta Transit Authority, 644 F.2d 434 (5th Cir. 1980); Rivers v. Rosenthal & Co., 634 F.2d 774 (5th Cir. 1980); Rogers v. Frito-Lay, Inc., 611 F.2d 1074 (5th Cir. 1980) (Goldberg, J., dissenting). The accurate account of the Supreme Court's implied cause of action cases in Noe, 644 F.2d at 436–437, need not be restated here. In summary, however, in Touche Ross & Co. v. Reddington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Su-

preme Court modified the application of the four-factor Cort test[13] by announcing that the task of a federal court in implied cause of action cases was solely to determine whether Congress intended to create the private right of action being asserted; by declining to consider the third and fourth Cort factors when it found the first two unsatisfied, the Court rendered the plaintiff's task more difficult because the third and fourth factors are considerably easier to satisfy than are the factors requiring proof of affirmative legislative intent. Noe, 644 F.2d at 436. The Supreme Court further restricted the availability of implied causes of action in Transamerica Mortgage Advisers, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). There, the Court refused to recognize an implied cause of action in § 206 of the Investment Advisors Act based solely on the fact that the second Cort factor, that there be an indication of legislative intent to create a private right of action, was not satisfied; that the first Cort factor was satisfied was immaterial. See Noe, 644 F.2d at 437. The most recent Supreme Court cases reiterate this concentration on legislative intent to the exclusion of the other Cort factors. See, e.g., Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. ——, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); Texas Industries, Inc., v. Radcliffe Materials, Inc., 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981).

 This court has taken to heart the restrictive mandate of the Supreme Court.[14] We have articulated principles of decision for implied right of action cases which appropriately guide our consideration of the jurisdictional question before us. If we are to conclude that Congress meant more than it said when it enacted a statute, we must do so on the basis that Congress actually intended to legislate as we infer. See, e.g.,

---

11. See note 8, supra, and accompanying text.

12. The cases referred to are Local Division 714, Amalgamated Transit Union v. Greater Portland Transit District, 589 F.2d 1 (1st Cir. 1978); Local Division 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility, 585 F.2d 1340 (7th Cir. 1978); and Local Division

1287, Amalgamated Transit Union v. Kansas City Area Transp. Auth., 582 F.2d 444 (8th Cir. 1978). See p. 422, infra.

13. See note 10, supra.

14. See note 3, supra.

*United States v. Capeletti Bros., Inc.*, 621 F.2d 1309, 1312, 1313 (5th Cir. 1980); *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1078 (5th Cir. 1980). The issue is not whether, on balance, advocates of judicial remedies have a better case than opponents, but whether we can find a legislative intent to recognize a federal judicial remedy. *Noe*, 644 F.2d at 439. In order for us to infer a private right of action, or federal jurisdiction, we must have before us clear evidence that Congress intended to provide such a remedy, *Rivers v. Rosenthal & Co.*, 634 F.2d 774, 783 (5th Cir. 1980), and if the legislative history provides no clear indication one way or the other, so that clear evidence of affirmative congressional intent is lacking, we cannot infer that Congress has legislated silently. *Id.* at 792.[15]

In practice, our implementation of the stated principles has yielded more restrictive results than our sister courts have reached. *Compare, e.g., Rivers v. Rosenthal & Co.*, 634 F.2d 774 (5th Cir. 1980) (no implied private right of action under Commodities Exchange Act), *with Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980), *cert. granted sub nom. New York Mercantile Exch. v. Leist*, 450 U.S. 910, 101 S.Ct. 1346, 67 L.Ed.2d 332 (1981) (implied right of action exists under Commodities Exchange Act), *and Curran v. Merrill Lynch, Pierce, Fenner & Smith*, 622 F.2d 216 (6th Cir. 1980), *cert. granted*, 451 U.S. 906, 101 S.Ct. 1971, 68 L.Ed.2d 293 (1981) (implied right of action exists under Commodities Exchange Act). *Compare also United States v. Capeletti Bros., Inc.*, 621 F.2d 1309 (5th Cir. 1980) (no implied private right of action under Davis-Bacon Act) *with McDaniel v. University of Chicago*, 548 F.2d 689 (7th Cir. 1977), *cert. denied*, 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978) (implied right of action exists under Davis-Bacon Act). With these

principles in mind, we turn our consideration to the UMTA.

## IV.

The Urban Mass Transportation Act of 1964 was prompted by Congress' awareness of the long neglected and deteriorating urban mass transit system in this country. By 1963, Congress had concluded that a new program of financial aid to facilitate the revitalization of the mass transit industry was necessary. H.R.Rep. No. 204, 88th Cong., 1st Sess., *reprinted in* [1964] U.S. Code Cong. & Ad.News 2569, 2572. The result of that determination was the Urban Mass Transportation Act of 1964.

Although it was not the intent of the bill to curtail collective bargaining rights, Congress recognized that in some instances, transit employees might be adversely affected by the introduction of new equipment or the reorganization of existing transit operations promoted by the legislation. *Id.* at 2583–2584. In particular, since the Act was to authorize grants or loans of federal funds to state or local public authorities to enable them to acquire private transit companies, employees of those companies would foreseeably become employees of the public agencies. When it passed the Act, Congress was concerned that such employees might lose collective bargaining rights, the right to strike, or pension and retirement benefits. Section 13(c) of the Act is designed to protect affected employees from such losses. *Id.*

The legislative history of § 13(c) includes no explicit reference to federal jurisdiction or a private right of action; the congressional debates on the Act included no discussion of the means of enforcing 13(c) agreements. *Local Division 1285, Amalgamated Transit Union v. Jackson Transit Auth.*, 650 F.2d 1379, 1384–85 (6th Cir.),

---

**15.** This is not to say that we can infer a jurisdictional grant only if the Union is able to point to an explicit statement in the legislative history to the effect that Congress intended to grant jurisdiction. "[W]hile the absence of anything in the legislative history that indicates an intention to confer any private right of action is hardly helpful to [the party asserting the right], it does not automatically undermine his position. [The Supreme] Court has held that the

failure of Congress expressly to consider a private remedy is not inevitably inconsistent with an intent on its part to make such a remedy available. Such an intent may appear implicitly in the language or structure of the statute or in the circumstances of its enactment." *Transamerica Mortgage Advisers v. Lewis*, 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979) (citations omitted).

*cert. granted,* —— U.S. ——, 102 S.Ct. 632, 70 L.Ed.2d 613 (1981) (*Jackson*). Thus, our task is to determine whether the legislative history manifests an unspoken intent by Congress to grant jurisdiction in the federal courts over private actions to enforce 13(c) agreements.

In its discussion of legislative intent,[16] the Union argues first that the language of UMTA § 13(c)[17] parallels the language of former § 5(2)(f) of the Interstate Commerce Act,[18] and that § 5(2)(f) arrangements are privately enforceable in federal court. It follows, argues the Union, that Congress must have intended that 13(c) agreements be privately enforceable in federal court.

The Congress that enacted the UMTA was indeed aware of § 5(2)(f) of the Interstate Commerce Act. In addition to the suggestive similarity of language, UMTA § 13(c) explicitly refers to 49 U.S.C. § 5(2)(f)[19] and the legislative history of § 13(c) refers to § 5(2)(f) as a model.[20]

The Union's argument founders, however, on the fact that at the time of the enactment of the UMTA, neither § 5(2)(f) of the Interstate Commerce Act nor § 5(2)(f) arrangements had been held to be privately enforceable. The principal case cited by the Union for the proposition that protective arrangements under § 5(2)(f) are enforceable at the instance of the protected employees and arise under federal law, *Norfolk & Western Ry. Co. v. Nemitz,* 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971), was decided 7 years after the passage of the UMTA.[21] The Union cites *Bhd. of Locomo-*

16. To avoid misrepresenting the Union's position, we note that the Union discusses the legislative history in the course of arguing that UMTA § 13(c) implies a private cause of action, and not that the statute implies a jurisdictional grant. For reasons we have noted, the Union's arguments are in most respects apposite in the present context. See p. 413, *supra.* In some instances, however, we have transposed the Union's arguments from the language of rights of action into the language of jurisdiction.

17. The language referred to is: "It shall be a condition of any assistance under this chapter that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include ..."

18. "As a condition of its approval, under this paragraph or paragraph (3), of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions ..." 49 U.S.C. § 5(2)(f) (1976). 49 U.S.C. § 5(2)(f) has been revised and recodified as 49 U.S.C. § 11347 (1979 Supp.).

19. UMTA § 13(c), 49 U.S.C. § 1609(c), states "... Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of this title."

20. In first proposing that some kind of labor protective arrangements be included in the Act, Labor Secretary Wirtz referred to § 5(2)(f). Hearings on S.6, before a Subcommittee of the Senate Committee on Banking and Currency, 88th Cong., 1st Sess. (1963), at 310. Thereafter, the General Counsel of the Amalgamated Transit Union reiterated that the antecedents for the kind of legislation he was proposing were contained in the labor protective provisions of § 5(2)(f). Hearings on S.6, *supra,* at 327.

The Senate Committee Report compares the proposed labor protective provision to comparable arrangements in the transportation industry. S.Rep. No. 82, 88th Cong. 1st Sess., at 12. In debates on the Senate floor, Senator Goldwater, in attempting to defeat the enactment of the labor protective provision, read into the record § 5(2)(f) of the Interstate Commerce Act as an example of the kind of development he foresaw if § 13(c) were not defeated. 109 Cong.Rec. 5677 (1963).

21. Although our treatment of *Nemitz* renders superfluous extended discussion of the case, it is highly doubtful that the case is apposite in any event. The jurisdictional issue in *Nemitz* was whether the Interstate Commerce Commission could be held to have reviewed a § 5(2)(f) agreement and to have incorporated the agreement into its order authorizing a railroad merger. If and only if the I.C.C. had so reviewed and incorporated the agreement was there jurisdiction under 28 U.S.C. § 1336, which grants to the district courts jurisdiction of civil actions to enforce I.C.C. orders. *See, Nemitz,* 404 U.S. at 42, note 3, 92 S.Ct. at 188, note 3; 404 U.S. at 52, 92 S.Ct. at 193 (Blackmun, J., dissenting).

*tive Engineers v. Chicago and North Western Ry. Co.*, 314 F.2d 424 (8th Cir.), *cert. denied*, 375 U.S. 819, 84 S.Ct. 55, 11 L.Ed.2d 53 (1963), for the proposition that § 5(2)(f) agreements had been held privately enforceable "for years" before passage of UMTA § 13(c). The cited case does not hold that § 5(2)(f) agreements are privately enforceable in federal court. The basic question in the case was whether the railway and the union were required to follow the procedures of the Railway Labor Act (45 U.S.C. § 151 et seq.) in effecting a proposed consolidation of two railroad yards, or whether they were required to follow the procedures set out in a "stipulation" entered into by the parties and approved by the Interstate Commerce Commission in its order approving the merger under 49 U.S.C. §§ 5(2)(f) and 5(11). The court quickly disposed of the defendant's jurisdictional challenge, noting with approval the district court's conclusion that "The problem is not one of interpretation of collective agreements, but . . . primarily involves the interpretation and effect of section 5(11) of the Interstate Commerce Act on an agreement for the protection of employees approved by the Interstate Commerce Commission under Section 5(2) of the Act." Since the issue raised was one of federal statutory interpretation, there was federal jurisdiction. 314 F.2d at 428.

Furthermore, the Union does not offer a shred of evidence that the Congress that enacted the UMTA thought that § 5(2)(f) arrangements were privately enforceable. Even if there were some pre-1964 authority for the private enforcement of § 5(2)(f) arrangements in federal court, therefore,

Congress' intent that 13(c) agreements be similarly enforceable would not necessarily follow. Thus, the view that the Congress that enacted the UMTA in 1964 must have intended 13(c) agreements to be privately enforceable in federal court because it modeled § 13(c) after another statute privately enforceable in federal court is untenable.[22]

Next, the Union correctly asserts that the legislative history of UMTA § 13(c) shows that Congress intended that affected employees be protected by privately enforceable protective arrangements. The relevant Senate Report states:

> The committee does not believe that it is feasible to enumerate or set forth in great detail the provisions that may be necessary to assure the fair and equitable treatment of employees in each case. In this respect, it is expected that specific conditions normally will be the product of local bargaining negotiation, subject to the basic standard of fair and equitable treatment.

S.Rep. No. 82, 88th Cong. 1st Sess. at 28. *See also* H.Rep. No. 204, 88th Cong. 1st Sess., *reprinted in* [1964] U.S.Code Cong. & Ad.News 2584–85. Furthermore, the Secretary of Labor, whom Congress authorized to determine that statutorily proper arrangements be made, has promulgated rules and regulations which rely upon privately negotiated agreements.[23]

It is indisputable that Congress relied on privately negotiated protective arrangements to secure the position of affected employees. And it would be absurd to suggest that Congress did not contemplate that such arrangements would be honored and,

---

**22.** A variation on the Union's argument is that even if the Congress that enacted UMTA § 13(c) was not aware that § 5(2)(f) arrangements are privately enforceable in federal court, the fact that they are is, by analogy, a persuasive reason to hold 13(c) agreements similarly enforceable. Even if it were clear that § 5(2)(f) arrangements are privately enforceable in federal court, the argument by analogy would fail because of the increasing disinclination to infer private federal remedies. See discussion at pp. 414–415, *supra.*

**23.** 29 C.F.R. § 215.3 states in relevant part:

(a)(1) If affected employees are represented by a labor organization it is expected that protective arrangements shall be the product of negotiation, pursuant to these guidelines.

\* \* \* \* \* \*

(b) Upon receipt of an application [for federal assistance subject to section 13(c)] involving affected employees represented by a labor organization, the Department of Labor will refer a copy of the application to that organization and notify the applicant of referral.

(c) Following referral and notification . . . parties will be expected to engage in good faith efforts to reach mutually acceptable protective arrangements through negotiation.

if necessary, enforced in court; as we have noted, there is a private cause of action for breach of 13(c) agreements. See p. 413, *supra.* But it simply does not follow that such arrangements are enforceable in federal court. We search the statute, the committee reports, and the congressional debates in vain for an intimation that Congress intended that federal courts resolve contractual disputes between municipal transit workers and their employers.

The Court of Appeals for the First Circuit concluded that it would be anomalous to leave to the courts of the fifty states the enforcement of 13(c) agreements that were approved by the Secretary of Labor and whose terms were specified in the federal grant contract. *Portland,* 589 F.2d at 13. We disagree. Particularly since actions such as the one before us require neither interpretation nor vindication of the UMTA, there is no reason to believe that state courts, in the performance of their traditional common law role, cannot decide these private breach of contract cases as suitably as can federal courts. *See, Jackson,* 650 F.2d at 1389 (Merrill, J., dissenting).[24]

Private actions arising out of alleged violations of express statutory commands differ in two significant respects from actions such as this one. First, such actions typically turn on whether particular conduct falls within the statutory proscription. Second, the factual questions raised by actions concerning a given statute typically display a uniformity that was foreseeable by Congress.[25] When Congress enacted the UMTA, on the other hand, it could not have foreseen with particularity the terms of the

required labor protective arrangements (or even that the arrangements would necessarily take the form of contracts). As the excerpt from S.Rep. No. 82 at p. 418, *supra,* states, Congress did not presume to enumerate or otherwise to anticipate the provisions which grant recipients and their employees would negotiate. The instant dispute is illustrative. The Union alleges that MARTA is in breach of the term of the 13(c) agreement providing that contract conditions would remain unchanged pending arbitration. Congress could not have foreseen the inclusion of such a provision in 13(c) agreements, and therefore could not have anticipated lawsuits alleging breaches of such a provision.

We do not find anomalous a reluctance to impute to Congress the intention to grant to federal courts jurisdiction over a class of cases raising an unpredictable array of case-specific issues whose resolution does not require interpretation of the federal statute. The disposition of this case requires a determination of the meaning of the 13(c) agreement between the parties, and such a determination is independent of the meaning of UMTA § 13(c).

The Union further contends that the UMTA makes provision for no alternative federal enforcement of 13(c) agreements, and argues therefrom that there must be federal jurisdiction over the employees' private enforcement action. The Union's premise is debatable. The Court of Appeals for the Sixth Circuit did recently hold that neither the Secretary of Labor nor the Secretary of Transportation has a statutory duty to enforce 13(c) agreements on behalf of transit employees, so that an action by a

---

**24.** Our analysis might differ if it were alleged that the 13(c) agreement was not a fair and equitable arrangement or did not provide as necessary for the objectives enumerated in UMTA § 13(c). But see discussion of *Kendler v. Wirtz,* 388 F.2d 381 (9th Cir. 1968) at p. 425, *infra.*

**25.** An example will illustrate our meaning. Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (1976), provides in part, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any

educational program or activity receiving Federal financial assistance." The sorts of primary disputes which characterize private actions to enforce § 901(a) were foreseeable by the enacting Congress and involve statutory interpretation: which programs and activities are "educational" within the statute; which persons are beneficiaries of the Act; when does an educational program or activity receive Federal financial assistance, and so on. The Supreme Court held in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), that a person aggrieved by a violation of § 901(a) has a private right of action.

local division of the Amalgamated Transit Union to compel the Secretaries to enforce a 13(c) agreement does not lie. *Local Division 1285, Amalgamated Transit Union v. Jackson Transit Auth.*, 650 F.2d 1379 (6th Cir.), *cert. granted*, —— U.S. ——, 102 S.Ct. 632, 70 L.Ed.2d 613 (1981). As the *Jackson* court recognized, 650 F.2d at 1388, this holding was at odds with dictum in *Portland, supra*, in which the First Circuit concluded that the Secretary of Transportation could sue in federal court to enforce the terms and conditions of 13(c) agreements.[26] Ironically, the *Portland* court offered its interpretation as a decisive argument in *favor* of inferring a private federal cause of action in behalf of the Union. Thus, the Union, which apparently persuaded the First Circuit in 1978 that the Secretary of Transportation can enforce 13(c) agreements in federal court in suits governed by federal contract law, and that the Union's enforcement actions should therefore be cognizable in federal court as well, argues in 1981 that since the Secretaries of Labor and Transportation have *no* role to play in enforcing 13(c) agreements, the Union must have a remedy in federal court.

MARTA contends that there are in fact alternative enforcement mechanisms for 13(c) contract rights. Because the terms of the mandated protective arrangements must be specified in the grant contract between the United States and the grantee, argues MARTA, the United States has a broad range of contract remedies: federal funds might be withdrawn; the United States could sue for breach of contract; and, in appropriate circumstances, a federal court could require specific performance of a grant contract condition.

We are spared the necessity of determining whether there exist federal mechanisms, other than private enforcement actions, to enforce 13(c) agreements by our conclusion that even if the Union's premise is accurate, it does not follow that jurisdiction over private enforcement actions lies in federal court. Our search is for some clear indication that Congress intended to grant jurisdiction over these cases to the federal district courts. We have conceded that Congress contemplated compliance with 13(c) agreements, and that private enforcement actions indisputably lie in state court. While the presence of explicit alternative statutory remedies would contraindicate any implied grant, *see, e.g., Till v. Unifirst Fed. Sav. and Loan Ass'n*, 653 F.2d 152, 160 (5th Cir. 1981); *United States v. Capeletti Bros., Inc.*, 621 F.2d 1309, 1315 (5th Cir. 1980), the converse follows neither in logic nor in law. We would not infer from the absence of alternative federal remedies for breach of 13(c) agreements an intent by Congress that there be such a remedy in federal court at the behest of private parties.

Turning finally to the principal discussion of the protection of transit workers in H.Rep. No. 204, relevant portions of which are set out in the margin,[27] we find no

---

**26.** If *Portland* and *Jackson* are reconcilable in this respect, it is on the basis that *Jackson* held that there was no *duty* to enforce 13(c) agreements, while *Portland* found that there was discretionary enforcement *authority*.

**27.** Although the problem of worker protection may arise in only a limited number of cases, the committee nevertheless believes that the overall impact of the bill should not be permitted to obscure the fact that in certain communities individual workers or groups of workers may be adversely affected as the result of the introduction of new equipment or the reorganization of existing transit operations. The principle of protecting workers affected as a result of adjustments in an industry carried out under the aegis of Federal law is not new, particularly in the transportation industry. Thus, railroad employees for years have enjoyed Federal protection against adverse effects attendant upon railroad consolidations. The problems of worker protection presented by the bill are not necessarily identical to those presented under other laws. The committee believes, however, that workers for whom a standard of benefits has already been established under other laws should receive equally favorable treatment under the proposed new program. The committee also believes that all workers adversely affected by adjustments effected under the bill should be fully protected in a fair and equitable manner, and that Federal funds should not be used in a manner that is directly or indirectly detrimental to legitimate interests and rights of such workers.

The bill, accordingly, contains a specific provision that, in communities where projects are to be assisted under the bill, fair

**1340**

support for the Union's position. The Union's cause is not advanced by our recognition that Congress intended to grant to affected transit workers benefits already enjoyed by railroad employees, since, at the time of the UMTA's enactment, railroad employees enjoyed no right to enforce in federal court private arrangements concluded pursuant to 49 U.S.C. § 5(2)(f). See *supra* pp. 417–418. The committee's acknowledgement that the problems of worker protection presented by the bill were not necessarily the same as those presented under other laws would indicate that absent some additional indication of Congressional intent, we would not be obliged to go beyond the language of the statute to equalize the benefits extended to transit workers with those extended to railroad workers. The statement that Federal funds should not be used in a manner that is directly or indirectly detrimental to legitimate interests and rights of affected workers suggests, if anything, that the focus of Congress was on the possible withholding of federal funds from uncooperative grant applicants, rather than on alternative remedies.

■ Having carefully reviewed the statute and its history, and having considered the arguments of the parties and the views of our sister courts, we simply do not find the requisite indication of congressional intent to vest in federal courts jurisdiction over actions for breach of 13(c) agreements. We therefore hold that the UMTA does not contain an implicit grant of jurisdiction over such actions to the federal courts.

> and equitable arrangements, as determined by the Administrator, must be made to protect the interests of affected transit employees. In determining whether arrangements are fair and equitable within the meaning of this provision, the Administrator must act only after consultation with the Secretary of Labor and with his concurrence.
>
> \* \* \* \* \* \*
>
> The committee wishes to point out that, subject to the basic standards set forth in the bill, specific conditions for worker protection will normally be the product of local bargaining and negotiation. The committee also expects that the Secretary of Labor, in addition to providing the Administrator with technical

### V.

The Union contends that the federal district court had jurisdiction over this case under 28 U.S.C. § 1331 (1976) [28] because a controversy between a public transit agency and a labor union involving an alleged breach of a 13(c) agreement arises under the laws of the United States. All five Circuits which have held that there is federal jurisdiction over private actions to enforce 13(c) agreements have done so on the basis that there was "arising under" jurisdiction under 28 U.S.C. § 1331. *See, Division 587, Amalgamated Transit Union v. Municipality of Metropolitan Seattle,* 663 F.2d 875 (9th Cir. 1981) (Seattle); *Jackson,* 650 F.2d at 1383; *Portland,* 589 F.2d at 8; *Local Division 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility,* 585 F.2d 1340, 1346 (7th Cir. 1978) (LaCrosse); *Local Division 1287, Amalgamated Transit Union v. Kansas City Area Transp. Auth.,* 582 F.2d 444, 450 (8th Cir. 1978) (Kansas City).

Our treatment of the jurisdictional question under 28 U.S.C. § 1331 is governed by our determination in Part II of this opinion that the Union alleges a common law breach of contract rather than a statutory violation. See pp. 411–412, *supra.* In *Gully v. First National Bank,* 299 U.S. 109, 112–13, 57 S.Ct. 96, 97–98, 81 L.Ed. 70 (1936), the Supreme Court said:

> How and when a case arises "under the Constitution or laws of the United States" has been much considered in the books. Some tests are well established. To bring a case within the statute, a right

> assistance, will assume responsibility for developing criteria as to the types of provisions that may be considered as necessary to insure that worker interests are adequately protected in the different types of situations that may arise.
>
> H.Rep. No. 204, 88th Cong., 1st Sess., *reprinted in* [1964] U.S.Code Cong. & Ad.News 2569, 2584–85.

**28.** "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331(a).

or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. *Starin v. New York*, 115 U.S. 248, 257, 6 S.Ct. 28 [31], 29 L.Ed. 388; *First National Bank v. Williams*, 252 U.S. 504, 512, 40 S.Ct. 372, 374, 64 L.Ed. 690. The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. Id.; *King County v. Seattle School District*, 263 U.S. 361, 363, 364, 44 S.Ct. 127, 128, 68 L.Ed. 339. A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto (*New Orleans v. Benjamin*, 153 U.S. 411, 424, 14 S.Ct. 905 [909], 38 L.Ed. 764; *Defiance Water Co. v. Defiance*, 191 U.S. 184, 191, 24 S.Ct. 63 [66], 48 L.Ed. 140; *Joy v. St. Louis*, 201 U.S. 332, 26 S.Ct. 478, 50 L.Ed. 776; *City and County of Denver v. New York Trust Co.*, 229 U.S. 123, 133, 33 S.Ct. 657 [662], 57 L.Ed. 1101), and the controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal. (*Tennessee v. Union & Planters' Bank*, 152 U.S. 454, 14 S.Ct. 654, 38 L.Ed. 511; *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126; *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410 [411], 57 L.Ed. 716; *Taylor v. Anderson*, 234 U.S. 74, 34 S.Ct. 724, 58 L.Ed. 1218). Indeed, the complaint itself will not avail as a basis of jurisdiction in so far as it goes beyond a statement of the plaintiff's cause of action and anticipates or replies to a probable defense. *Devine v. Los Angeles*, 202 U.S. 313, 334, 26 S.Ct. 652 [657], 50 L.Ed. 1046; *The Fair v. Kohler Die & Specialty Co., supra.*

For a recent case reaffirming these principles, *see Phillips Petroleum Co. v. Texaco Inc.*, 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974). *See generally* 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3562 (1975). The essential inquiry is thus whether the complaint, on its face, alleges a cause of action based on a right created by federal law, and whether the construction given to the federal law will be pivotal in the particular case.

As we have emphasized, the Union's complaint alleges a cause of action based not on a right created by federal law, but on a common law right created by contract. As we have also noted, see pp. 419–420, *supra*, resolution of the merits of the controversy between the Union and MARTA will not turn on the construction of UMTA § 13(c). Nor is any federally created right an essential element of the Union's cause of action; the right to a remedy for breach of a 13(c) agreement is a common law right which Congress surely recognized but did not create when it enacted UMTA § 13(c). See pp. 418–419, *supra*.

The Union relies on *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). *Bell* was an action for damages brought by private parties against FBI agents for alleged violations of the plaintiffs' fourth and fifth amendment rights. The lower courts dismissed the case for want of federal jurisdiction. The Supreme Court reversed, holding that because the complaint squarely sought recovery on the ground that the agents violated the Constitution, federal question jurisdiction existed regardless of whether or not there was a federal cause of action or whether the complaint also alleged a state law claim. The Court stated the jurisdictional rule:

> [W]here the complaint, as here, is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, but for two possible exceptions . . ., must entertain the suit.
>
> . . . The . . . exceptions are that a suit may sometimes be dismissed for want of jurisdiction where the alleged claim . . . clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.

*Id.* at 681–83, 66 S.Ct. at 776.

Although the Union's claim *purports* to seek enforcement of UMTA § 13(c), we have seen that the claim seeks no recovery under the statute, but necessarily seeks

only a common law remedy for breach of the underlying 13(c) agreement. See p. 411, *supra*. Thus, the Union's complaint does not satisfy the predicate of the *Bell* test, that the complaint be so drawn as to seek recovery directly under the Constitution or laws of the United States. Even if we accepted the Union's assertion that its complaint seeks recovery under UMTA § 13(c), it is abundantly clear that the Union's asserted claim under UMTA § 13(c) is immaterial and made solely for the purpose of obtaining jurisdiction; the alleged statutory violation purports to add to the Union's complaint nothing but a predicate for federal jurisdiction.

 Nor does the fact that the Union's complaint necessitated the interpretation of UMTA § 13(c) in Part IV of this opinion somehow render this an "arising under" case. *Marshall v. Gibson's Products, Inc.*, 584 F.2d 668 (5th Cir. 1978),[29] stands for the proposition that a complaint which necessitates a determination whether Congress intended that a particular federal statute confer jurisdiction over a class of cases does not, without more, arise under that statute. The issue in *Marshall* was whether the federal district court had subject matter jurisdiction over a suit by the Secretary of Labor to enjoin an employer to submit to an inspection of its premises under the Occupational Safety and Health Act. The principal inquiry there, as here, was whether the Act itself included an implied congressional grant of jurisdiction. We held that it did not. The complaint had alleged alternative subject matter jurisdiction under 28 U.S.C. § 1337 (1976), which provides in pertinent part: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . ." We summarily disposed of the jurisdictional argument predicated on 28 U.S.C. § 1337:

> It would be anomalous indeed . . . to suggest that an action "arises under" an act that impliedly rejects jurisdiction to bring the action. The specific preclusion controls the general grant.

584 F.2d at 677 (footnotes omitted).

Our holding in Part IV of this opinion was based not on the premise that Congress in UMTA § 13(c) impliedly rejected federal jurisdiction over actions to enforce 13(c) agreements, but rather on our conclusion that the Union had not shown that Congress affirmatively intended UMTA § 13(c) as a jurisdictional grant. Since *Marshall* is in this respect distinguishable from this case it does not dispose of the jurisdictional question under 28 U.S.C. § 1331[30] now before us. However, *Marshall* does foreclose the contention that the Union's complaint states a claim arising under UMTA § 13(c) *because* it requires an exploration of the meaning and history of that statute.

The Union urges that *Int'l Ass'n of Machinists v. Central Airlines, Inc.*, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963), compels by analogy the conclusion that this action arises under federal law. In that case, a board of adjustment had been established by an agreement between Central Airlines and its employees' union pursuant to section 204 of the Railway Labor Act, 45 U.S.C. § 184 (1976), which provides in relevant part:

> It shall be the duty of every carrier and of its employees . . . to establish a board of adjustment of jurisdiction not exceeding the jurisdiction which may be lawfully exercised by system, group, or regional boards of adjustment, under the authority of section 153 of this title.

The airline refused to comply with an award of the adjustment board on the ground that the board had exceeded its

---

**29.** Regarding the binding authority of this Fifth Circuit precedent, see note 3, *supra*.

**30.** That jurisdiction in *Marshall* was premised on 28 U.S.C. § 1337 rather than on 28 U.S.C. § 1331 is immaterial, since the same principles govern "arising under" jurisdiction under both statutes. *Jersey Central Power & Light Co. v. Local Unions 327, 749, 1289, 1298, 1303, 1309,* and 1314 of Int'l. Bhd. of Elec. Workers, 508 F.2d 687 (3d Cir. 1975), *cert. denied sub nom. Jersey Central Power & Light Co. v. EEOC*, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976); *Carlson v. Coca-Cola Co.*, 483 F.2d 279 (9th Cir. 1973); *Florida East Coast Ry. Co. v. Jacksonville Terminal Co.*, 328 F.2d 720 (5th Cir.), *cert. denied*, 379 U.S. 830, 85 S.Ct. 59, 13 L.Ed.2d 38 (1964).

jurisdiction and authority as set forth in the agreement between the parties. *Int'l Ass'n of Machinists v. Central Airlines, Inc.*, 295 F.2d 209, 211 (5th Cir. 1961), *rev'd*, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963). The litigation arose when the union sought enforcement of the award in federal court. The Supreme Court held that the action to enforce the award arose under federal law and therefore gave rise to federal jurisdiction. 372 U.S. at 696, 83 S.Ct. at 964.

■ If *Central Airlines* were on all fours with the case before us, it would of course govern our decision. However, the case is readily distinguishable and is not controlling here.[31] The Court in *Central Airlines* placed great emphasis on the notion that "the statute and the federal law must determine whether the contractual arrangements made by the parties are sufficient to discharge the mandate of § 204 and are consistent with the Act and its purposes." 372 U.S. at 691, 83 S.Ct. at 961. "Whether Central must comply with the award or whether, instead, it is impeachable, are questions controlled by federal law and are to be answered with due regard for the statutory scheme and purpose." *Id.*, at 695, 83 S.Ct. at 964. In the event of a controversy concerning a § 204 contract or a § 204 adjustment board, any necessary harmonizing of the private arrangement with the statutory purpose could occur only through the litigation process; the Railway Labor Act provides no other federal oversight of the private arrangement. Quite the contrary is true of 13(c) arrangements. Unlike the Railway Labor Act, UMTA § 13(c) seeks to ensure the fulfillment of the statutory mandate of a fair and equitable arrangement by requiring the approval of such arrangements by the Secretary of

Labor as a condition of grant assistance. Indeed, the statute recognizes the Secretary's competence to determine what arrangements are "fair and equitable" and "necessary" to the statutory objectives. For that reason, the judgment of the Secretary of Labor as to what arrangements are fair and equitable has been held to be controlling, so that it would be inappropriate for a court to substitute its judgment for the Secretary's. *Kendler v. Wirtz*, 388 F.2d 381 (9th Cir. 1968). Thus, the underlying premise of *Central Airlines*, that federal adjudication of actions to enforce awards by § 204 adjustment boards is necessary to the vindication of the statutory mandate, is inapplicable here.[32]

Second, the decision in *Central Airlines* rested in significant part on aspects of the legislative history of 45 U.S.C. § 184 which UMTA § 13(c) does not share. The Supreme Court noted in *Central Airlines* that when Congress extended the Railway Labor Act to the air transportation industry in 1936, it neither extended the jurisdiction of the National Railroad Adjustment Board to the air transportation industry nor created an analogous board for that industry. Instead, as a provisional measure pending the anticipated establishment of a national board for the airlines industry, Congress required the formation of system, group, or regional boards of adjustment in 45 U.S.C. § 184. 372 U.S. at 685–86, 83 S.Ct. at 958–59. Following further discussion of the legislative history, the Court stated:

> [W]e believe Congress intended no hiatus in the statutory scheme when it postponed the establishment of a National Air Transport Adjustment Board and instead provided for compulsory system, group, or regional boards. Although the

---

31. The majority of our sister courts, though relying to some extent on *Central Airlines*, have found it less than controlling. *See Jackson*, 650 F.2d at 1383 (". . . lends further support to our conclusion"); *Portland*, 589 F.2d at 8 ("Our conclusion . . . is reinforced by [*Central Airlines*]"); *Kansas City*, 582 F.2d at 450. *But see, LaCrosse*, 585 F.2d at 1346 ("direct authority"). The *Portland* court explicitly conceded that *Central Airlines* is not on all fours with the instant case. 589 F.2d at 8, n.6.

32. As we have noted, Central Airlines had refused to comply with the adjustment board's award on the basis that the board had exceeded its jurisdiction and authority under the § 204 agreement between the parties. Since § 204 expressly limits the jurisdiction of the adjustment boards, see p. 425, *supra*, it appears that the case particularly required the harmonization of contract and statute which the Court emphasized. Here, there is no assertion that the 13(c) agreement may be impeached because it is insufficient to discharge the mandate of UMTA § 13(c).

system boards were expected to be temporary arrangements, we cannot believe that Congress intended an interim period of confusion and chaos or meant to leave the establishment of the Boards to the whim of the parties. Instead, it intended the statutory command to be legally enforceable in the courts and the boards to be organized and operated consistent with the purposes of the Act.

*Id.* at 690, 83 S.Ct. at 961.

Thus, the Court's interpretation of 45 U.S.C. § 184 was influenced by its conclusion that the statute was an interim measure which Congress intended to accomplish the purposes of the National Railroad Adjustment Board pending the establishment of a National Air Transport Adjustment Board. No such consideration pertains here.

Significantly, the statutory scheme governing the National Railway Adjustment Board specified, as the Court observed, that the Board's awards were to be final and binding. *Id.* at 688, 83 S.Ct. at 960. This fact, coupled with the Court's conclusion that Congress intended no hiatus in the statutory scheme, implies that awards by § 204 adjustment boards would be similarly final and binding; two of our sister courts, in discussing *Central Airlines*, have in fact understood the Railway Labor Act to so provide. *Portland*, 589 F.2d at 8; *LaCrosse*, 585 F.2d at 1346. If Congress indeed intended to require that § 204 adjustment board awards be final and binding, a predicate for federal jurisdiction would exist which has no counterpart here.

■■■ Finally, the adjustment board whose award the union sought to enforce in *Central Airlines* was expressly required by 45 U.S.C. § 184. Thus, as the Court noted, the board was a "creation[ ] of federal law." *Id.* at 692, 83 S.Ct. at 962. UMTA § 13(c), on the other hand, nowhere mandates that the required labor protective arrangements be embodied in a contract between a grant recipient and its employees. *See Portland*, 589 F.2d at 12. In that respect, a 13(c) agreement is not a creation of federal law and is a less suitable candidate for federal enforcement than was the award of the

statutorily required adjustment board in *Central Airlines.*

For these reasons, *Central Airlines* does not dissuade us from our conclusion that an action for breach of a 13(c) agreement does not arise under federal law.

■■■ The Union's contention that this action arises under the federal common law is similarly unavailing. It is correct that a case "arises under the laws of the United States" for purposes of 28 U.S.C. § 1331 if the disposition of the issues set out in the complaint requires the application of federal common law. *Illinois v. City of Milwaukee*, 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972). However, this is not such a case.

MARTA's competence to enter into a 13(c) agreement, or any contract, is a matter of local law. MARTA's authority to agree to and perform particular contractual conditions is likewise governed by local law. The Union offers no persuasive reason for interpreting according to federal common law its contract with an entity whose existence, competence to contract, and authority to agree to and perform particular contractual conditions are controlled entirely by local law.

The Union cites *Industrial Indemnity, Inc. v. Landrieu*, 615 F.2d 644 (5th Cir. 1980), and *Trans-Bay Engineers & Builders, Inc. v. Hills*, 551 F.2d 370 (D.C.Cir.1976), in support of its assertion that enforcement of a 13(c) agreement is a matter of federal common law. *Industrial Indemnity* and *Trans-Bay* are inapposite. *Trans-Bay* held that a general contractor's suit against the federal insuror of a federally financed housing project arose under federal common law where the alleged obligation of the insuror was rooted not in a contract between the parties but rather "on equitable rights generated by [the insuror's] course of activities pursuant to federal statutes, including the contracts it . . . sponsored, and prescribed for others, as a condition of federal aid." 551 F.2d at 377. Glaring and dispositive differences between *Trans-Bay* and our case are apparent: the Secretary of Labor is not a party to this case and no obligation rooted in equitable rights generated by the

Department of Labor's activities is asserted. Furthermore, the *Trans-Bay* court stated, "In ruling against federal question jurisdiction, the district court treated this case as a mere suit on a contract. It relied on *Lindy v. Lynn*, 501 F.2d 1367, 1369 (3rd Cir. 1974), but that was concerned with the interpretation of a set of admittedly valid and binding contracts." *Id.* Our case, unlike *Trans-Bay*, deals with the interpretation of admittedly valid and binding contracts. *Industrial Indemnity* relies on and adds nothing to *Trans-Bay*, 615 F.2d at 647, and requires no additional discussion.

Nor does *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), a leading Supreme Court decision on the application of federal common law, advance the Union's position. That case held that a federal grant of jurisdiction could be the basis for implying federal substantive remedies, but the *Lincoln Mills* Court was deciding a choice of law question—whether to apply state or federal law to suits for violation of labor contracts—in a context in which jurisdiction in the federal courts was clear. The question before us, of course, *is* jurisdiction; we have no jurisdictional grant from which to infer a congressional intention that we fashion a federal law of 13(c) agreements. *See, Nolan v. Meyer*, 520 F.2d 1276, 1278 (2d Cir.), *cert. denied*, 423 U.S. 1034, 96 S.Ct. 567, 46 L.Ed.2d 408 (1975).

▮ We have considered also the factors other courts have weighed in determining the applicability of federal common law in particular situations: congressional intent; the extent to which the right asserted is a creature of congressional enactment; whether the area of activity involves essential government functions; whether the effectiveness of federal law or of a federal program demands a uniform national rule; whether the asserted right, duty, or status is created by the state; and whether following state law would frustrate a federal policy. *See*, 1A, Moore's Federal Practice ¶ 0.323[22], at 3397–98 (2d Ed. 1981). Our consideration of these factors fortifies our conclusion that the interpretation of the 13(c) agreement in this case is a matter of local, not federal, law.[33]

## VI.

Finally, the Union contends that 42 U.S.C. § 1983 (1976), affords a predicate for

---

**33.** The methodology of our opinion differs markedly from that of the five Courts of Appeals which have decided the issues we have addressed here. Generally, those courts have inquired first whether there is federal jurisdiction over the case under 28 U.S.C. § 1331 and have held, on varying rationales, that there is. *See, Seattle*, 663 F.2d at 878; *Jackson*, 650 F.2d at 1383; *Portland*, 589 F.2d at 8; *LaCrosse*, 585 F.2d at 1346–48; *Kansas City*, 582 F.2d at 450. They have then held, with varying degrees of reliance on the *Cort v. Ash* paradigm, that UMTA § 13(c) implies a private right of action. *See, Seattle*, 663 F.2d at 878; *Jackson*, 650 F.2d at 1386; *Portland*, 589 F.2d at 16; *LaCrosse*, 585 F.2d at 1350. (*Kansas City*, 582 F.2d 444, did not address the implied right of action issue.)

Even if we adopted this methodology and likewise concluded that an action to enforce a 13(c) agreement arises under federal law, we would hold that the Union's complaint failed to state a claim upon which relief could be granted because UMTA § 13(c) does not imply a private right of action. This conclusion would be compelled by an analysis nearly identical to that in Part IV of this opinion, and would be fortified by the absence in UMTA § 13(c) of right- or duty-creating language in favor of the Union. See note 10, *supra*.

Although the result we have reached and the result an implied right of action inquiry would yield are in most respects equivalent, see note 8, *supra*, and accompanying text, one distinction should be noted: a holding that the district court lacks subject matter jurisdiction absolutely precludes the district court from entertaining pendent state claims. *See Jackson v. Stinchcomb*, 635 F.2d 462 (5th Cir. 1981); *Silva v. Vowell*, 621 F.2d 640 (5th Cir. 1980), *cert. denied sub nom. Johnston v. Silva*, 449 U.S. 1125, 101 S.Ct. 941, 67 L.Ed.2d 111 (1981). Thus, our disposition of this case is to vacate the district court's order *in toto*, even to the extent that that order might be construed as pertaining to the Union's state law contract claim. A dismissal for failure to state a claim, on the other hand, would not have the same absolutely preclusive effect on a pendent state claim. However, since the proper procedure in almost all cases is to dismiss pendent state claims when the federal claims are dismissed before trial, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Pharo v. Smith*, 621 F.2d 656 (5th Cir. 1980), this distinction is of limited practical importance.

federal jurisdiction. The Union proceeds again from the premise that breach of a 13(c) agreement constitutes a violation of UMTA § 13(c) and argues that 42 U.S.C. § 1983 provides a cause of action under the rule of *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), and *Cuyler v. Adams*, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981). Jurisdiction would then lie under 28 U.S.C. § 1331,[34] since the action would arise under 42 U.S.C. § 1983. Our rejection of the assertion that to breach a 13(c) agreement is to violate UMTA § 13(c), see pp. 411–412, *supra*, disposes of the Union's argument for federal jurisdiction based on a violation of 42 U.S.C. § 1983.

## VII.

For the reasons stated above, we hold that the district court lacked jurisdiction over the subject matter of this case. Therefore, we vacate the order of the district court and remand the case with the instruction that the Union's complaint be dismissed for lack of jurisdiction.

VACATED and REMANDED with instructions to DISMISS.

VANCE, Circuit Judge, dissenting:

The panel majority has decided that federal courts lack subject matter jurisdiction over a suit to enforce the provisions of a labor protective agreement signed by appellant as a condition to the receipt of federal funds under section 13(c) of the Urban Mass Transit Act, 49 U.S.C. § 1609(c). The majority reaches this decision despite the existence of persuasive authority from the five other circuits that have considered this question and reached the opposite conclusion. *See Division 587, Amalgamated Transit Union v. Municipality of Metropolitan Seattle*, 663 F.2d 875 (9th Cir. 1981); *Local Division 1285, Amalgamated Transit Union*

v. Jackson Transit Authority, 650 F.2d 1379 (6th Cir.), cert. granted, —— U.S. ——, 102 S.Ct. 632, 70 L.Ed.2d 613 (1981); *Division 1235, Amalgamated Transit Union v. Metropolitan Transit Authority*, 650 F.2d 1389 (6th Cir. 1981); *Local Division No. 714, Amalgamated Transit Union v. Greater Portland Transit District*, 589 F.2d 1 (1st Cir. 1978); *Local Division 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility*, 585 F.2d 1340 (7th Cir. 1978); *Division 1287, Amalgamated Transit Union v. Kansas City Area Transportation Authority*, 582 F.2d 444 (8th Cir. 1978). These courts have each found that a suit to enforce a section 13(c) agreement is a suit that "arises under" federal law and is thus subject to the jurisdiction of the federal courts. They have also found that a union which brings such a suit states a federal cause of action.[1]

This newborn split between the circuits may be of short duration. The Supreme Court has granted certiorari in the *Jackson Transit Authority* case and presumably will resolve the issue. In the meanwhile, we are bound by extant Supreme Court authority. In *International Association of Machinists v. Central Airlines, Inc.*, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963), the Supreme Court held that a suit to enforce a private agreement mandated by federal law may be brought in federal court. The five other circuits have cited *Central Airlines* as authority for finding jurisdiction here, and nothing in the majority opinion persuades me otherwise.

Based on the reasoning of the other circuits, I would also find that the union in this case stated a federal cause of action and that the district court did not abuse its discretion by issuing an injunction.

---

**34.** See note 28, *supra*.

**1.** Unlike the panel majority, each of five other circuits has addressed the question of subject matter jurisdiction before considering the existence of an implied cause of action under section 13(c). That order of consideration is mandated by Supreme Court precedent, *Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776,

90 L.Ed. 939 (1946). *See, e.g., Division 1287, Amalgamated Transit Union v. Kansas City Area Transp. Auth.*, 582 F.2d 444, 449 (8th Cir. 1978) ("The question of whether a particular case is one that 'arises under' the Constitution or laws of the United States ... is entirely separate and distinct from the question of whether the plaintiff's complaint states a claim upon which relief can be granted ....").